HANCOCK INDUSTRIES and Ace Service Corp. and Eastern Waste Removal and Charles Crumbley, Inc. and Edward Lawrenson, Inc.

v.

SCHAEFFER, Erik J., individually and in his official capacity as Executive Director of Chester County Solid Waste Authority, and Chester County Solid Waste Authority and County of Chester and Petaccio, Victor, individually and in his official capacity as Executive Director of Delaware County Incinerator (Solid Waste) Authority, and Delaware County Incinerator (Solid Waste) Authority and County of Delaware

Appeal of HANCOCK INDUSTRIES, Ace Service Corporation, Eastern Waste Removal and Edward Lawrenson, Inc.

No. 86–1266.

United States Court of Appeals, Third Circuit.

Argued Nov. 4, 1986.

Decided Feb. 6, 1987.

Nolan N. Atkinson, Jr., Mark Lipowicz (argued), Atkinson & Archie, Philadelphia, Pa., for appellants.

Joseph A. Tate (argued), Stephen D. Brown, Alison M. Benders, Schnader, Harrison, Segal & Lewis, Jon A. Baughman, Jonathan A. Broder, Pepper, Hamilton & Scheetz, Philadelphia, Pa., James E. McErlane, Lamb, Windle & McErlane, West Chester, Pa., for appellees J. Erik Schaeffer, Chester County Solid Waste Authority, and County of Chester.

Before SLOVITER and STAPLETON, Circuit Judges, and FARNAN, District Judge.[*]

*Honorable Joseph J. Farnan, Jr., United States District Judge for the District of Delaware, sit-

**OPINION OF THE COURT**

STAPLETON, Circuit Judge:

The Chester County Solid Waste Authority ("Chester Authority") owns and operates the Lanchester Landfill. The Delaware County Incinerator (Solid Waste) Authority ("Delaware Authority") owns and operates the Colebrookdale Landfill. This lawsuit by private haulers of Philadelphia solid waste was precipitated by the closing of these landfills to waste originating outside of the respective counties other than that which the Authorities were required to accept by contract. The haulers, who sought access to the landfills through this suit, appeal a grant of summary judgment in favor of the defendants. Because the haulers challenge the procedure followed by the district court, we first trace the course of the proceedings in the district court.

I.

On June 4, 1985, the haulers filed suit against the Chester Authority, its executive director, J. Erik Schaeffer, and Chester County for closing the Lanchester Landfill to out-of-county waste not contracted for, and against the Delaware Authority, its executive director, Victor Petaccio, and Delaware County for closing the Colebrookdale Landfill to out-of-county waste. The haulers alleged that the closings violated their rights under the equal protection clause, the due process clause, and the federal antitrust laws.

Also on June 4, the haulers moved *ex parte* for a temporary restraining order and accelerated discovery. The district court denied the motion for a temporary restraining order, stating that if the haulers were unable to reach an accommodation with the defendants before June 30, 1985, the date that out-of-county waste would be excluded from the Lanchester Landfill, the court would schedule a hearing on the haulers' motion for a preliminary injunction. The court did not rule on the motion to

ting by designation.

accelerate discovery and the haulers did not pursue the matter. On June 26, 1985, the haulers renewed their motion for a preliminary injunction.

On June 28, 1985, defendants Petaccio, the Delaware Authority, and Delaware County filed a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) or, in the alternative, for summary judgment pursuant to Fed.R.Civ.P. 56. On July 1, 1985, defendants Schaeffer and the Chester Authority filed a motion to dismiss for failure to state a claim. Also on July 1, the district court entered an order setting a "preliminary injunction hearing" for July 5 and requiring submission of proposed facts and conclusions of law by July 3. At a conference with the parties on July 1, the district court advised that the other pending motions might also be considered at the July 5 hearing. On July 3, defendant Chester County filed a motion to dismiss for failure to state a claim or, in the alternative, for summary judgment.

On July 3, the haulers filed a motion to postpone consideration of summary judgment and permit discovery pursuant to Fed.R.Civ.P. 56(f). At the hearing on July 5, the haulers renewed this request. Suggesting that only legal issues were in dispute, the district court sought to determine what material facts the haulers hoped to uncover through discovery. The haulers asserted that discovery was necessary to determine whether or not a rational basis existed for the decision to close the landfills to out-of-county waste.

To "create some kind of record ... either for summary judgment argument or for a preliminary injunction hearing," and to determine therefrom "what material facts may or may not be in dispute," app. at 192, the court permitted various defense witnesses to testify and be cross-examined, admitted stipulated facts into evidence, and accepted the parties' proffers as to what their witnesses would say if they testified. Before closing arguments, the court inquired whether plaintiffs still pursued their Rule 56(f) motion and, if so, as to what facts. Plaintiffs stated that they did and

that "additional testimony is required on the issue of the actions taken by the officials at the Lanchester Landfill on the overall ultimate issues as to arbitrariness or whether there was a rational basis for their actions." *Id.* at 278.

In a bench opinion on July 5, the district court denied the haulers' motion for a preliminary injunction, finding that they were unlikely to succeed on any of their claims. The court further granted defendants summary judgment on the due process claim, because the haulers had no property right at stake, and on the antitrust claim, because the defendants were immune under the state action exemption to the federal antitrust laws and, even if not, their actions did not violate the antitrust laws. In a written opinion filed August 7, the district court elaborated upon its reasoning and made findings of fact, some of which were based upon the testimony of the defense witnesses. The court granted the haulers thirty days discovery on the equal protection claim, but rejected the Rule 56(f) motion as to the due process and antitrust claims on the ground that no material facts were in dispute. The haulers thereafter conducted discovery directed to the issue of whether the actions of the Authorities had a rational basis.

Later in August, defendants Schaeffer, the Chester Authority, and Chester County renewed their request for summary judgment on the equal protection claim. On December 9, finding that plaintiffs failed to establish the existence of any genuine issue of material fact, the district court granted summary judgment on the equal protection claim on the ground that "the distinction between in-county and out-of-county trash drawn by the Authority bears a rational relationship to the statutory obligation imposed on the county to provide for adequate and safe disposition of solid waste generated within Chester County." *Hancock Industries v. Schaeffer,* 625 F.Supp. 373, 377 (E.D.Pa.1985).

The haulers appeal the orders of summary judgment on their antitrust and equal protection claims as to defendants Schaef-

fer, the Chester Authority, and Chester County, but do not appeal similar orders of summary judgment granted in favor of defendants Petaccio, the Delaware Authority, and Delaware County. The haulers also do not appeal the grant of summary judgment in favor of defendants on the haulers' due process claim.

## II.

■ The haulers first assert that the district court erred in granting summary judgment on their antitrust claim without giving the minimum notice required by Fed.R. Civ.P. 56(c) and further erred in denying the haulers' Rule 56(f) motion for a continuance of the summary judgment proceeding to permit the haulers to conduct discovery. In addition, the haulers argue that the district court improperly granted summary judgment on both the antitrust and equal protection claims based on the district court's assessment of the credibility of the witnesses at the July 5 evidentiary hearing.

Before the July 5 hearing, Schaeffer and the Chester Authority sought dismissal pursuant to Rule 12(b)(6). Rule 12(b) provides that if, on a Rule 12(b)(6) motion, "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Because the Chester County defendants tendered "matters outside the pleading," the district court had the option of treating their Rule 12(b)(6) motions as motions for summary judgment. This court has held, however, that the "reasonable opportunity" provision of Rule 12(b) incorporates the minimum notice provision of Rule 56(c). "To exercise the right to oppose summary judgment, a party must

have notice." *Bryson v. Brand Insulations, Inc.*, 621 F.2d 556, 559 (3d Cir.1980). "Thus litigants are entitled to 10 days notice before a Rule 12(b)(6) motion to dismiss may be converted into a Rule 56 motion for summary judgment." *Crown Central Petroleum Corp. v. Waldman*, 634 F.2d 127, 129 (3d Cir.1980); *accord Winkleman v. New York Stock Exchange*, 445 F.2d 786, 789 (3d Cir.1971).

In this case, the haulers were not provided with 10 days notice that summary judgment would be considered at the July 5 hearing. Nonetheless, we find that the failure to comply with the minimum notice requirement of Rule 56(c) was harmless error in the context of this case. In *Davis Elliott International, Inc. v. Pan American Container Corp.*, 705 F.2d 705 (3d Cir.1983), we noted that even where the 10 day notice requirement has been violated, a grant of summary judgment for a defendant may be affirmed where there is no "state of facts on which plaintiff could conceivably recover." *Id.* at 708; *accord Brobst v. Columbus Services International*, 761 F.2d 148, 155 (3d Cir.1985). As we will detail more fully hereafter, because the defendants are immune, as a matter of law, from the haulers' antitrust claim pursuant to the state action exemption to the federal antitrust laws, there is no state of facts on which the haulers could conceivably recover on their antitrust claim.[1]

■ The haulers further contend that the district court erred in denying discovery pursuant to Rule 56(f) on their antitrust claim. Rule 56(f) provides that, if it appears "from the *affidavits* of a party opposing the motion that he cannot for reasons stated present by affidavit *facts* essential to justify his opposition," the court may order a continuance to permit discovery. (Emphasis added). In *Mid-South Grizzlies v. National Football*

---

1. We are mindful of the fact that the 10 day notice provision of Rule 56(c) is intended to provide an opportunity to research and present the law as well as an opportunity to marshal the facts. Accordingly, there are undoubtedly cases where it would be unfair to schedule a summary judgment motion on a few days notice even where the facts are not in dispute. Here, however, the haulers fully briefed the law applicable to their antitrust claim in support of their motion for a preliminary injunction.

*League,* 720 F.2d 772 (3d Cir.1983), *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2657, 81 L.Ed.2d 364 (1984), we noted that:

> Where Rule 56(f) affidavits have been filed, setting forth specific reasons why the moving party's affidavits in support of a motion for summary judgment cannot be responded to, and the facts are in the possession of the moving party, we have held that a continuance of the motion for purposes of discovery should be granted almost as a matter of course.

*Id.* at 779.

Nonetheless, we find that the district court did not err in denying discovery on the haulers' antitrust claim. As a procedural matter, the haulers' Rule 56(f) motion was insufficient. The haulers did not file a Rule 56(f) affidavit. *See id.* at 780. Moreover, even if we treat plaintiffs' motion as an affidavit, it fails to explain the need for discovery and what material facts the haulers hoped to uncover to support their allegations. *See id.* To state that "information is known to us, that simply must be pursued via discovery and deposition before the plaintiffs are in a position to respond," app. at 161, is insufficient; such information must be revealed to the court.

Even if we were inclined to overlook the motion's technical deficiencies, however, the motion fails on a substantive ground. Because the haulers' antitrust claim was properly resolved as a matter of law on the basis of stipulated facts, factual discovery was unnecessary. *Euster v. Eagle Downs Racing Association,* 677 F.2d 992, 997 (3d Cir.), *cert. denied,* 459 U.S. 1022, 103 S.Ct. 388, 74 L.Ed.2d 519 (1982). Indeed, the haulers arguably conceded this point when they told the district court at the July 5 hearing only that additional discovery was needed on defendants' rational basis in closing the landfills.

The haulers' third attack on the procedure employed in the district court evidences a basic misunderstanding of how the district judge utilized the information he received at the July hearing. As we read the record, the judge used that information for three different purposes, each of which was legitimate and each of which is consistent with the rule, expressly acknowledged by the district judge, that summary judgment cannot be based on a resolution of disputes concerning material facts.

First, the district court used the July hearing as the record basis for his decision on the haulers' motion for a preliminary injunction. In this context it was entirely appropriate for the court to make tentative decisions regarding disputed facts in order to assess the likelihood of success, irreparable injury, and the other factors upon which *pendente lite* relief turns. *Sims v. Greene,* 161 F.2d 87, 88–89 (3d Cir.1947). The court's August 7 decision was addressed almost entirely to the preliminary injunction motion and "findings of fact" were made therein because they are required by Fed.R.Civ.P. 52(a) when a decision is made granting or refusing a preliminary injunction. *Bateman v. Ford Motor Co.,* 310 F.2d 805, 807 (3d Cir.1962). It was in this context that the judge found the witnesses of the Chester County defendants to be "credible."

■ Second, the district court utilized the testimony at the July hearing to determine what facts were *not* in dispute. This also was appropriate. Rule 56(c) provides that the "judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Testimony given in an evidentiary hearing is no different from testimony given in a deposition and may be treated the same in summary judgment proceedings. 6 J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice* ¶ 56.-11[8] (2d ed. 1986).[2] As with deposition

---

**2.** A number of courts have held that the use of oral testimony on a summary judgment motion is specifically authorized by Fed.R.Civ.P. 43(e).

*See, e.g., Stewart v. RCA Corp.,* 790 F.2d 624, 628–29 (7th Cir.1986); *Walters v. City of Ocean Springs,* 626 F.2d 1317, 1322 (5th Cir.1980).

testimony and affidavits, if there is no contradictory evidence, facts testified to in a hearing may be accepted as true for summary judgment purposes without an assessment of the credibility of the witness. The trial judge in this case, however, had no occasion to rely upon facts vouched for only by the testimony of a witness. A statement of stipulated facts was received into evidence at the July 5 hearing and all of the facts found by the district court to be material to the antitrust and equal protection claims were among those stipulated by the parties.

■ Finally, while the district court relied primarily on the stipulation of facts, it may have also looked to the testimony of the defendants' witnesses for an articulation of the public purpose which the decisions limiting access to the landfills were intended to serve. Under the substantive law governing analysis of equal protection claims where there is no contemporaneous articulation of purpose, it is appropriate to consider governmental decisionmakers' after-the-fact articulations of the purposes of the challenged governmental action, just as it is appropriate in such situations to consider similar statements by counsel for the decisionmakers and conceivable purposes that the court may infer from the character of the action and the surrounding circumstances. *Delaware River Basin Commission v. Bucks County Water & Sewer Authority,* 641 F.2d 1087, 1097 (3d Cir.1981). We perceive no reason why it is inappropriate in conducting such an analysis to consider statements of purpose made by the decisionmakers under oath in open court.

### III.

Having resolved the haulers' procedural challenges, we now turn to the merits of the district court's grant of summary judgment. "Rule 56 allows the trial court to grant summary judgment if it determines

from its examination of the allegations in the pleadings and any other evidential source available that no genuine issue as to a material fact remains for trial, and that the moving party is entitled to judgment as a matter of law.... On review, the appellate court is required to apply the same test the district court should have utilized initially. Inferences to be drawn from the underlying facts contained in the evidential sources submitted to the trial court must be viewed in the light most favorable to the party opposing the motion. The non-movant's allegations must be taken as true and, when these assertions conflict with those of the movant, the former must receive the benefit of the doubt." *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). As to materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* Further, a dispute over a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### IV.

The following facts are undisputed. The Chester Authority was incorporated in accordance with the Municipality Authorities Act of 1945, Pa.Stat.Ann. tit. 53, § 301 *et seq.* (Purdon 1974 & Supp.1986). (Stipulated Fact No. 1). Chester County established the Chester Authority "to carry out its functions under the Solid Waste Management Act," Pa.Stat.Ann. tit. 35,

This court has previously utilized oral testimony at a preliminary injunction hearing to establish a genuine issue of material fact requiring reversal of summary judgment. *Bolt Assocs. v. Alpine Geophysical Assocs.,* 365 F.2d 742, 750 (3d Cir.1966); *see also Winkleman v. New York Stock Exchange,* 445 F.2d 786, 788 (3d Cir.1971) (recognizing district court's use of oral testimony from a previous preliminary injunction hearing in ruling on summary judgment motion).

§ 6018.101 *et seq.* (Purdon Supp.1986). (Stipulated Fact No. 3). The Solid Waste Management Act makes each municipality in Pennsylvania "responsible for the collection, transportation, processing, and disposal of municipal waste which is generated or present within its boundaries." Pa.Stat. Ann. tit. 35, § 6018.202(a); (Stipulated Fact No. 4).[3]

The Chester "Authority is empowered to acquire and operate solid waste disposal facilities for Chester County." (Stipulated Fact No. 5). The Chester Authority acquired the Lanchester Landfill. (Stipulated Fact No. 6). The Chester "Authority intended the Lanchester site to provide for the disposition of solid waste generated in Chester County for the next (15) years." (Stipulated Fact No. 15). The Chester "Authority revised its Lanchester acceptance policy to accept only Chester County waste and those wastes covered by long-term contracts." (Stiplated Fact No. 17). The Chester "Authority's decision is a policy for Lanchester only." (Stipulated Fact No. 24).

It is also undisputed that the amount of waste deposited monthly at Lanchester increased, with the exception of one month, from December 1984 to May 1985. The haulers note that documentary evidence submitted to the district court before its December 9 opinion indicates that the estimates of volume increases given by the defense witnesses at the July 5 hearing were higher than the increases actually experienced, but the same documents establish that volume levels had increased during the period prior to the Chester Authority's exclusion of out-of-county waste not contracted for.

## V.

■ The haulers assert that the district court erred in holding that defendants were immune under the state action exemption to the federal antitrust laws.[4] The court below construed *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 105 S.Ct. 1713, 83 L.Ed.2d 24 (1985), to hold that "once a municipality is authorized to act to perform a particular governmental function, it is immune from antitrust liability if the resulting anticompetitive effects would logically flow from this authority." App. at 343. Finding that the Pennsylvania Solid Waste Management Act placed a duty on municipalities and counties to dispose of their own waste, the district court concluded that closure of a landfill owned by a municipal or county authority to out-of-county waste "is a logical consequence of the state created power and obligation of a municipality to provide for the disposal of its own waste." *Id.* at 347. We agree.[5]

The haulers, however, assert that *Hallie* is inapposite because the Supreme Court in that case relied upon several state statutes that expressly authorized the challenged conduct and, in this case, no state statute expressly authorizes the exclusion of out-of-county waste from a landfill owned by a municipal authority. This contention is without merit.

*Hallie* is the latest articulation of the state action exemption to the federal antitrust laws recognized in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315

---

**3.** The Solid Waste Management Act defines "municipality" to include "[a] city, borough, incorporated town, township or county or any authority created by any of the foregoing." Pa. Stat.Ann. tit. 35, § 6018.103 (Purdon Supp. 1986).

**4.** The parties agree that *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985), is the controlling case. The haulers allege antitrust violations by both Chester County and the Chester Authority. The parties have not drawn a distinction between the standard applicable to the county, a political subdivision, and that applicable to the authority, a state agency, *Commonwealth v. Erie Metropolitan Transit Authority,* 444 Pa. 345, 281 A.2d 882, 884 (1971), and we will apply the same standard to both actors in this case.

**5.** Because we find defendants immune under the state action exemption, we do not consider the possible applicability of the Local Government Antitrust Act of 1984, Pub.L. No. 98–544, 98 Stat. 2750 (codified at 15 U.S.C.A. §§ 34–36 (West Supp.1986)). *See Skepton v. County of Bucks,* 613 F.Supp. 1013 (E.D.Pa.1985).

(1943). "In *Parker*, relying on principles of federalism and state sovereignty, the Court refused to construe the Sherman Act as applying to the anticompetitive conduct of a State acting through its legislature." *Hallie*, 471 U.S. at 38, 105 S.Ct. at 1716. The Court in *Hallie* noted that municipalities, not being sovereign themselves, may obtain exemption only if they "demonstrate that their anticompetitive activities were authorized by the State 'pursuant to state policy to displace competition with regulation or monopoly public service.'" *Id.* at 39, 105 S.Ct. at 1716 (quoting *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 413, 98 S.Ct. 1123, 1136, 55 L.Ed.2d 364 (1978)).

The *Hallie* Court addressed the issue of "how clearly a state policy must be articulated for a municipality to be able to establish that its anticompetitive activity constitutes state action." *Id.* 471 U.S. at 40, 105 S.Ct. at 1717. It concluded that the municipality "need not 'be able to point to a specific, detailed legislative authorization'" that expressly mentions anticompetitive actions. *Id.* at 39, 105 S.Ct. at 1717 (quoting *Lafayette*, 435 U.S. at 415, 98 S.Ct. at 1138). Rather, it is sufficient if the legislature has delegated the "authority to take action that foreseeably will result in anticompetitive effects." *Id.* 471 U.S. at 43, 105 S.Ct. at 1719.

The haulers' argument amounts to a contention that the clear articulation test required the Pennsylvania Solid Waste Management Act to expressly authorize the challenged conduct. A similar argument was expressly rejected in *Hallie*. *Id.* at 42, 43–44, 105 S.Ct. at 1718, 1718–19. Under *Hallie*, the issue before the district court was whether exclusion of out-of-county waste from a landfill owned by an authority created to provide for disposal of Chester County waste "logically would result from [the] broad authority to regulate" granted by the Solid Waste Management Act. *Id.* at 42, 105 S.Ct. at 1718.

That Act states that: "Each municipality shall be responsible for the ... disposal of municipal waste which is generated or present within its boundaries...." Pa. Stat.Ann. tit. 35, § 6018.202(a). Section 6018.201 requires municipalities to submit to the Pennsylvania Department of Environmental Resources detailed plans for waste management. These provisions impose a substantial duty as well as effecting a broad delegation of authority. That Chester County could organize a municipal authority to acquire a landfill and fulfill the County's obligations under the Act is not challenged. *See id.* § 6018.103 (defining "municipality" to include "any authority" created by a county). The haulers admit that "[t]he County of Chester established the Authority to carry out its functions under the Solid Waste Management Act." (Stipulated Fact No. 3).

On its face, the exclusion of out-of-county waste from a landfill acquired by a municipal authority organized to fulfill a county's obligation to provide for disposal of that county's waste appears logically to result from the duty placed upon the municipality by the state statute. Indeed, it would appear illogical to assume that the legislature contemplated that a municipal authority-owned landfill would be required to accept waste from other municipalities, thus shifting the burden established by § 6018.202(a) on to whichever municipality acquired a landfill. The defendants in this case are compelled by the Pennsylvania statute to provide for the disposal of municipal waste. As noted in *Hallie*, "compulsion affirmatively expressed may be the best evidence of state policy." 471 U.S. at 45–46, 105 S.Ct. at 1720. Although defendants were not compelled to exclude out-of-county waste, once the decision was made to provide for disposal of municipal waste through the acquisition of a landfill, the possibility of such exclusion logically followed.

The haulers assert that such an exclusion violates a state policy of regional planning and cooperation in waste disposal. They argue that the Solid Waste Management Act reflects this policy by requiring the state Department of Environmental Resources to develop a "statewide" plan with

an emphasis on "area-wide" planning. Pa. Stat.Ann. tit. 35, § 6018.104(3). As the district court pointed out, "area" is not defined in the Act, but § 6018.201(b) requires each municipality to submit a plan for "areas" within its jurisdiction, a county is the largest unit within the definition of "municipality" contained in § 6018.103, and thus "one can conclude that the legislature had in mind municipal or county-wide planning." App. at 348.

Plaintiffs also argue that the decision in *Municipality of Monroeville v. Chambers Development Corp.*, 88 Pa.Cmwlth. 603, 491 A.2d 307 (1985), indicates the legislative emphasis on regional planning and its intent to preempt regulation of sanitary landfills. As noted by the district court, that case held only that municipal regulation of the operation of a privately-owned landfill was preempted. In the present case, defendants are only regulating the use of a landfill that they own.[6]

Before the district court, the haulers based their antitrust claim solely upon the anticompetitive effects of the defendants' exclusionary policy and upon the assertion that adoption of that policy was not authorized by a clear state policy. Before us, they assert that if they had been allowed discovery before the district court addressed the antitrust immunity issue they might have been able to show that the Chester Authority decisionmakers had ulterior motives when they adopted the exclusionary policy. To illustrate the point, they call our attention to a newspaper article, published after the district court's decision, indicating that the Authority may renew its long-term contract with the City of Philadelphia when that contract expires at the end of 1987. Based upon this article, the haulers suggest that the challenged exclusionary policy was adopted so that the Chester Authority would be in a position to negotiate a better contract with the City or,

as the haulers put it, to extort an unconscionable price from the City.

■ We reject the haulers' argument for the fundamental reason that the subjective motivation of public decisionmakers is irrelevant to state antitrust immunity analysis. In *Euster v. Eagle Downs Racing Association*, 677 F.2d 992 (3d Cir.), *cert. denied*, 459 U.S. 1022, 103 S.Ct. 388, 74 L.Ed.2d 519 (1982), we noted that the "Supreme Court has never held that motivation is a factor in the 'state action' [antitrust exemption] analysis" where the challenged policy is adopted by a public agency. *Id.* at 997 n. 7. Based on the rationale of *Parker v. Brown* and the caselaw subsequent to *Euster*, we predict that the Supreme Court will ultimately hold that the subjective motivation of state and local decisionmakers need not be explored in this context.

We agree with the Ninth Circuit's analysis and conclusion in *Llewellyn v. Crothers*, 765 F.2d 769 (9th Cir.1985):

The availability of *Parker* immunity ... does not depend on the subjective motivations of the individual actors, but rather on the satisfaction of the objective standards set forth in *Parker* and authorities which interpret it. This must be so if the state action exemption is to remain faithful to its foundations in federalism and state sovereignty. A contrary conclusion would compel the federal courts to intrude upon internal state affairs whenever a plaintiff could present colorable allegations of bad faith on the part of defendants.

*Id.* at 774; *see also Hoover v. Ronwin,* 466 U.S. 558, 581 n. 34, 104 S.Ct. 1989, 2002 n. 34, 80 L.Ed.2d 590 (1984) (permitting a challenge in an antitrust case to the motive of a bar examination committee in adopting a grading formula would impose substantial discovery and litigation burdens and

6. Plaintiffs further rely on the federal Solid Waste Disposal Act, 42 U.S.C. § 6901 *et seq.*, its emphasis on regional planning, and the congressional finding that suitable landfill sites are becoming scarce. Given the rationale underlying the decision in *Parker v. Brown,* 317 U.S.

341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), we fail to perceive the relevancy of federal legislative intent in adopting the Solid Waste Disposal Act to the issue of whether defendants' conduct is immune from antitrust liability as state action.

"deter 'able citizens' from performing this essential public service").

We also find support for this view in the *Hallie* Court's analysis of the active state supervision requirement of the state exemption doctrine. In *California Retail Liquor Association v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), the Court held that when a state has delegated decisionmaking to private parties, two elements must be established before the private decisionmakers are entitled to the state's antitrust immunity:

> First, the challenged restraint must be "one clearly articulated and affirmatively expressed as state policy"; second, the policy must be "actively supervised" by the State itself.

*Id.* at 105, 100 S.Ct. at 943 (quoting *Lafayette*, 435 U.S. at 410, 98 S.Ct. at 1135).

In *Hallie*, the Court concluded that the second element of the *Midcal* analysis did not apply when a municipality was the decisionmaker.[7] 471 U.S. at 46, 105 S.Ct. at 1720. The Court explained that active supervision is "one way of ensuring that the actor is engaging in the challenged conduct pursuant to state policy." *Id.* This assurance is required when "a private party is engaging in the anticompetitive activity, [because] there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State." *Id.* at 47, 105 S.Ct. at 1720. The *Hallie* Court contrasted this private decisionmaking situation with one in which a municipality is engaging in the challenged conduct:

> Where the actor is a municipality, there is little or no danger that it is involved in a *private* price-fixing arrangement. The only real danger is that it will seek to

further purely parochial public interests at the expense of more overriding state goals. This danger is minimal, however, because of the requirement that the municipality act pursuant to a clearly articulated state policy. Once it is clear that state authorization exists, there is no need to require the State to supervise actively the municipality's execution of what is a properly delegated function.

*Id.*

The Court's conclusion that minimal risks are involved where the decisionmaker is a public body reinforces its insistence that routine state action not be subject to federal court antitrust scrutiny. Emphasizing that the statutory authorization must only show that " 'the legislature contemplated the *kind of* action complained of,' " *id.* at 44, 105 S.Ct. at 1719 (quoting *Lafayette*, 435 U.S. at 415, 98 S.Ct. at 1138) (emphasis added), the *Hallie* Court noted that requiring "explicit authorization by the State [of the challenged anticompetitive conduct] might have deleterious and unnecessary consequences." *Id.* In developing this point, the Court observed:

> Requiring such a close examination of a state legislature's intent to determine whether the federal antitrust laws apply would be undesirable also because it would embroil the federal courts in the unnecessary interpretation of state statutes. Besides burdening the courts, it would undercut the fundamental policy of *Parker* and the state action doctrine of immunizing state action from federal antitrust scrutiny. See 1 P. Areeda & D. Turner, Antitrust Law ¶ 212.3(b) (Supp. 1982).

*Id.* 471 U.S. at 44 n. 7, 105 S.Ct. at 1719 n. 7.[8]

---

7. The Supreme Court further noted that, "[i]n cases in which the actor is a state agency, it is likely that active state supervision would also not be required." 471 U.S. at 46 n. 10, 105 S.Ct. at 1720 n. 10.

8. In the cited text, Professor Areeda explains the hazards of permitting a challenge similar to that asserted by the haulers:

> To be sure, state law "authorizes" only agency decisions that are substantively and proce-

durally correct. Errors of fact, law, or judgment by the agency are not "authorized." Erroneous acts or decisions are subject to reversal by superior tribunals because unauthorized. If the antitrust court demands unqualified "authority" in this sense, it inevitably becomes the standard reviewer not only of federal agency activity but also of state and local activity whenever it is alleged that the governmental body, though possessing the

This admonition against close federal court scrutiny of the extent of state statutory authorization, together with the Court's determination that active state supervision of municipal decisionmaking is not a prerequisite to antitrust immunity, persuades us that the subjective motivation of public decisionmakers is not relevant in state antitrust immunity analysis. Because the district court correctly concluded on the basis of stipulated facts that the Chester County defendants are entitled to antitrust immunity, we affirm its summary judgment on the haulers' antitrust claim.

## VI.

The haulers insist that the district court erred in granting defendants summary judgment on their equal protection claim because they had tendered evidence which allegedly contradicted the rational basis put forth by the defense witnesses. The district court found that the haulers failed to establish "the existence of any genuine issue of material fact." *Hancock Industries*, 625 F.Supp. at 377. Further finding that "the distinction between in-county and out-of-county trash drawn by the Authority bears a rational relationship to the statutory obligation imposed on the county to provide for adequate and safe disposition of solid waste generated within Chester County," the court concluded that the defendants were "entitled to judgment as a matter of law." *Id.* We agree.

At the July 5 hearing, Larry Boling, Chairman of the Chester Authority, and J. Erik Schaeffer, its executive director, testified that: the Chester Authority planned "to preserve landfill space for the citizens of [Chester] county for the next 15 years," app. at 205; the Chester Authority would achieve that goal if it accepted between 1750 and 2200 tons of waste per day, *id.* at 204–05; the optimum daily tonnage, the "comfort zone," was between 1700 and 2200 tons, *id.* at 224; the volume of waste deposited increased and exceeded that amount no later than January 1985, *id.* at 205, 224–25, 237; the increase created environmental problems and the larger volume could not be compacted properly, *id.* at 206, 229; and, to reduce the volume, short-term contracts with private haulers of non-Chester County waste were not extended. *Id.* at 207. Although Chairman Boling testified that his "primary" concern was for the environment, *id.* at 206, the defendants emphasized, in their argument to the district court, their concern over the premature exhaustion of the landfill.

In their opposition to summary judgment, the haulers urged that evidence gained through discovery contradicted the witnesses' testimony and created genuine disputes of material fact. They also insist that summary judgment was inappropriate because "the ultimate factfinder would ... be free to discredit the defendants' entire testimony with regard to their alleged 'rational basis' for the exclusion." *Id.* at 390. The evidence relied upon by the haulers is dealt with more fully in the district court's opinion. 625 F.Supp. at 375–77. In brief, the haulers produced log reports showing that the volume of waste entering the landfill in various months was less than the witnesses had estimated. The haulers further argued that the absence of any discussion of environmental problems in the minutes of the Authority's meetings indicated that environmental concerns did not exist. The haulers also disputed the landfill's life expectancy, noting that, even if existing capacity were used up, the Chester Author-

---

power to engage in the challenged conduct, has actually exercised its power in a manner not authorized by state law. We should not lightly assume that *Lafayette*'s authorization requirement dictates transformation of state administrative review into a federal antitrust job. Yet that would be the consequence of making antitrust liability depend on an undiscriminating and mechanical demand for "authority" in the full administrative law sense.

This concern is not fanciful. If an allegation of agency error or other unauthorized action is enough to deny antitrust immunity for public agencies, virtually every zoning decision, franchise grant, utility tariff ruling, or other routine governmental act will be subject to antitrust scrutiny....

P. Areeda & D. Turner, *Antitrust Law* ¶ 212.3(b) (Supp.1982).

ity could apply for a permit to expand the landfill. On the basis of the above facts and various other disputes with the witnesses' testimony, the haulers asserted that summary judgment would be inappropriate.

The district court found that the haulers did not establish a genuine dispute of material fact. The court noted that, although the witnesses had overestimated the volume of waste deposited in various months, the log reports established that volume had increased dramatically from September 1984 to May 1985. The court found the absence of discussion of environmental problems from the minutes of the Authority's formal meetings and the other disputes raised by the haulers irrelevant to "whether there was a rational relationship between the action finally taken by the Authority and the interest in providing for disposition of in-county trash." *Hancock Industries*, 625 F.Supp. at 376. The haulers urge this court to find that the court below erred. We decline to do so.

The haulers misperceive the appropriate inquiry under the governing law. The classification drawn by the Chester Authority is between haulers bearing in-county waste and waste that the Authority is legally bound by contract to accept and haulers bearing other out-of-county waste. Because this classification does not discriminate against suspect classes or impinge upon a fundamental interest, the Chester Authority's policy must meet only the rational basis standard.[9] Thus, this court

"must determine if the [exclusionary policy] rationally furthers *any* legitimate state objective." *Malmed v. Thornburgh*, 621 F.2d 565, 569 (3d Cir.), *cert. denied*, 449 U.S. 955, 101 S.Ct. 361, 66 L.Ed.2d 219 (1980).

■ When faced with a challenge to a governmental classification under the rational basis test, a court should ask, first, whether at least one of the purposes of the classification involves a legitimate public interest and, second, whether the classification is rationally related to achievement of that purpose. *U.S. Railroad Retirement Board v. Fritz*, 449 U.S. 166, 184, 101 S.Ct. 453, 464, 66 L.Ed.2d 368 (1980) (Brennan, J., dissenting). Neither of these inquiries, however, involves the court in a determination of historic fact and, accordingly, the court has no occasion to inquire into the subjective motives of the decisionmakers. The court accepts at face value contemporaneous declarations of the legislative purposes, or, in the absence thereof, rationales constructed after the fact,[10] unless "an examination of the circumstances forces [the court] to conclude that they 'could not have been a goal of the legislation.'" *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 463 n. 7, 101 S.Ct. 715, 723 n. 7, 66 L.Ed.2d 659 (1981) (quoting *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 n. 16, 95 S.Ct. 1225, 1223 n. 16, 43 L.Ed.2d 514 (1975)). Thus, where "there are plausible reasons for [the legislative] action, [the court's] inquiry is at an end. It is, of

9. As stated by this court in *Delaware River Basin Comm'n v. Bucks County Water & Sewer Auth.*, 641 F.2d 1087 (3d Cir.1981):

Neither party to this appeal suggests that, because the challenged classification was devised by an administrative rather than legislative body, principles other than those of conventional "bottom tier" equal protection scrutiny should apply. Moreover, in applying rationality analysis, courts generally do not subject administrative action to more exacting scrutiny than that accorded legislative decisions.

*Id.* at 1093 n. 11; *see Shelton v. City of College Station*, 780 F.2d 475 (5th Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986). Therefore, we shall apply the conventional rational basis test in this case.

10. This court recently examined whether, in seeking a legislative purpose supporting a provision under equal protection challenge where the legislative history does not disclose any purpose, the court is limited to considering only actual, articulated purposes. *Delaware River Basin Comm'n*, 641 F.2d at 1094–97. We concluded: "So long as we are careful not to attribute to the legislature purposes which it cannot reasonably be understood to have entertained, we find that in examining the challenged provisions we may consider purposes advanced by counsel for the Commission or suggested initially by ourselves." *Id.* at 1097 (footnote omitted).

course, 'constitutionally irrelevant whether this reasoning in fact underlay the legislative decision.' " *U.S. Railroad Retirement Board*, 449 U.S. at 179, 101 S.Ct. at 461 (quoting *Flemming v. Nestor*, 363 U.S. 603, 612, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960)).

■ Similarly, when a court inquires whether the legislative action is rationally related to achievement of the statutory purposes, it need not decide whether the facts available to the legislature are more likely than not true. As the Supreme Court explained in *Vance v. Bradley*, 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979):

> In ordinary civil litigation, the question frequently is which party has shown that a disputed historical fact is more likely than not to be true. In an equal protection case of this type, however, those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.

*Id.* at 110–11, 99 S.Ct. at 949. Accordingly, it is not enough for one challenging a statute on equal protection grounds to introduce evidence tending to support a conclusion contrary to that reached by the legislature. If the legislative determination that its action will tend to serve a legitimate public purpose "is at least debatable", the challenge to that action must fail as a matter of law. *United States v. Carolene Products Co.*, 304 U.S. 144, 154, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938).

As noted by the district court, the haulers, "do not dispute that the proper disposal of county trash is a legitimate state interest." *Hancock Industries*, 625 F.Supp. at 375. It is also undisputed that

the Solid Waste Management Act has put the burden of disposing of municipal waste upon the municipality within which the waste is generated or situated. It is further undisputed that the Chester Authority was created to fulfill Chester County's duty under the Act and purchased Lanchester Landfill to do so. It is thus apparent that providing for the continued disposal of Chester County trash is a legitimate interest of the Chester Authority and would constitute a legitimate purpose for the exclusionary policy under attack.[11]

Nonetheless, the haulers appear to press their equal protection challenge on two grounds: first, that even if preservation of landfill capacity for Chester County trash would be a legitimate purpose, that purpose was not in fact the defendants' true purpose; and, second, if that was their true purpose, that the exclusion of out-of-county waste not contracted for is not rationally related to the legitimate purpose of preserving capacity for Chester County waste.[12]

With respect to the haulers' first challenge, as the Supreme Court has made clear, we must "assume that the objectives articulated by the [governmental decisionmaker] are actual purposes of the [governmental policy], unless an examination of the circumstances forces us to conclude that they 'could not have been a goal of [that policy].' " *Clover Leaf Creamery Co.*, 449 U.S. at 463 n. 7, 101 S.Ct. at 723 n. 7 (quoting *Weinberger v. Wiesenfeld*, 420 U.S. at 648 n. 16, 95 S.Ct. at 1233 n. 16). Here, the haulers' evidence, even with all inferences drawn in their favor, is insufficient to force us to conclude that preserving landfill capacity for Chester County waste could not have been a goal of the exclusionary policy. The haulers' evidence

---

**11.** The district court did not consider whether concern over potential environmental contamination would constitute a legitimate purpose and, though we believe it would, we need not reach that issue here.

**12.** The haulers have argued to this court that they have raised facts that would permit a jury to infer that defendants' alleged concern to preserve Lanchester Landfill for county waste was

a mere pretext to extort higher prices for accepting out-of-county waste. Arguably, that purpose would be rationally related to the legitimate goal of financing disposal of the county's waste. However, this argument was not made to the district court and, in any event, as indicated above, the decisionmakers' subjective motivation is irrelevant to rational basis analysis.

creates a dispute of fact as to the rate of increased volume, but even if their evidence is credited over that tendered by the defendants, preserving landfill capacity for Chester County waste is still a logical goal of the challenged action.

The haulers' second challenge fails because, on its face, the exclusionary policy is rationally related to preserving limited capacity for Chester County waste. The proposition that the exclusion of out-of-county waste will preserve limited capacity for county waste is simply indisputable.

[redacted] Thus, even though the record discloses disputes of fact, under the applicable substantive rules of equal protection analysis, resolution of all of those disputes in favor of the haulers could not affect the outcome. In such circumstances, summary judgment was appropriate. *Vance v. Bradley,* 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979). Accordingly, we hold that the district court did not err in granting defendants summary judgment on plaintiffs' equal protection claim.

## VII.

[redacted] On July 8, 1986, during the briefing of this appeal, the haulers filed a motion which the supporting memorandum describes as a motion "Pursuant to Fed.R. Civ.P. 60(b)." The motion asks that if this court affirms the judgment of the district court on all grounds appealed, the case be remanded for consideration of "newly discovered" evidence.[13] It is unclear to us whether the haulers seek to have us make the necessary inquiries under Rule 60(b)(2) and remand if we find the requirements of that rule met, or whether they seek a remand so that the district court can make the necessary inquiries under Rule 60(b)(2). If the haulers seek the former, we decline to consider their motion; the place for a Rule 60(b)(2) motion is in the district court.

If the haulers seek a remand so that the district court can consider a Rule 60(b)(2) motion, the relief they seek is simply unnecessary. Now that this appeal is concluded, the district court is free to consider any motion the haulers may choose to file seeking relief from the judgment. Our affirmance of the judgment on the basis of the record as it existed prior to the appeal "[does] not limit the power of the district court to consider Rule 60(b) relief." *Sellers v. General Motors Corp.,* 735 F.2d 68, 69 (3d Cir.1984).

The haulers' motion states that "[p]ursuant to Fed.R.Civ.P. 60(b) the matter is brought to this Court's attention at this time, at the first available opportunity to raise the issue—in order that the issue not be deemed to have been waived by the plaintiffs." Accordingly, it is possible that the haulers anticipate a problem with the one year time limitation on relief under Rule 60(b)(2) and hope that a remand will alleviate that problem. We think not. The one year "time limit is not extended by the maintenance of an appeal." *Egger v. Phillips,* 710 F.2d 292, 329 (7th Cir.), *cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983); *accord, e.g., Carr v. District of Columbia,* 543 F.2d 917, 926 (D.C.Cir.1976). The one year time limit has now run and a remand will not alter that fact.

This is not a harsh result. If the haulers had been willing to delay consideration of their appeal, they could have filed their Rule 60(b)(2) motion in the district court within the one year period and then sought a remand from this court. In *Main Line Federal Savings & Loan Association v. Tri-Kell, Inc.,* 721 F.2d 904 (3d Cir.1983), we approvingly noted the following procedure:

> When an appellant in a civil case wishes to make a [Rule 60(b)] motion ... while his appeal is still pending, the proper procedure is for him to file his motion in the District Court. If that court indicates that it will grant the motion, the appellant should then make a motion in this court for a remand of the case in order that the District Court may grant the motion....

13. The discovery of this "newly discovered" evidence is said to have been occasioned by the May 8, 1986 newspaper article referred to above.

*Id.* at 906 (quoting *Smith v. Pollin*, 194 F.2d 349, 350 (D.C.Cir.1952)).

We emphasized our approval of that procedure in *Venen v. Sweet*, 758 F.2d 117 (3d Cir.1985). In that case, we recognized that:

> Most Courts of Appeals hold that while an appeal is pending, a district court, without permission of the appellate court, has the power both to entertain and to deny a Rule 60(b) motion. If a district court is inclined to grant the motion or intends to grant the motion, those courts also hold, it should certify its inclination or its intention to the appellate court which can then entertain a motion to remand the case. Once remanded, the district court will have power to grant the motion, but not before.

*Id.* at 123 (citing cases); *accord, e.g., Gould v. Mutual Life Insurance Co. of New York*, 790 F.2d 769, 772 (9th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 580, 93 L.Ed.2d 582 (1986); *Egger,* 710 F.2d at 329; *Carr,* 543 F.2d at 926.

### VIII.

The judgment against the haulers will be affirmed. The motion "Pursuant to Fed.R. Civ.P. 60(b)" will be denied.