Gregory **OTTENSMEYER, Individually and t/a A.A. Answering Service; Melissa Ottensmeyer, Individually and t/a A.A. Answering Service; Telecom, Inc.; Appellants,**

v.

**CHESAPEAKE & POTOMAC TELEPHONE COMPANY OF MARYLAND, a Maryland Corporation; American Telephone and Telegraph Co., Incorporated in the State of Maryland, Appellees.**

No. 84–1068.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 6, 1984.

Decided Feb. 26, 1985.

Mercedes C. Samborsky, Joppatowne, Md., for appellants.

Robert G. Levy, Baltimore, Md. (Frank, Bernstein, Conaway & Goldman, Baltimore, Md., Deborah Droller, Margaret E. Garber, Baltimore, Md., on brief), and Harlan Sherwat, Washington, D.C., for appellees.

Before RUSSELL, PHILLIPS and MURNAGHAN, Circuit Judges.

MURNAGHAN, Circuit Judge:

The instant appeal stems from an action brought by Gregory Ottensmeyer and his wife, Melissa, against the Chesapeake and Potomac Telephone Company of Maryland ("C & P") and American Telephone and Telegraph Company ("AT & T") in the United States District Court for the District of Maryland. The Ottensmeyers sought treble damages for alleged violations of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2.[1] The gravamen of the

---

1. 15 U.S.C. § 1 reads:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint

appellants' complaint was that the appellees violated the Antitrust Act by instigating a search and seizure on the appellants' business premises. According to the Ottensmeyers, engaging the Maryland State Police to perform the search and seizure was an unlawful ploy to squash a competing business entity. The appellants also challenged, on a monopolization of trade theory, an agreement entered into between C & P and the Ottensmeyers which prohibited Mr. Ottensmeyer from participating in the operation of appellants' answering service.

The district court awarded summary judgment in favor of C & P and AT & T.[2] We affirm the grant of summary judgment for the reasons set forth by the court below which are summarized herein.

The material facts are not in dispute. In April 1976, the Ottensmeyers began operating the A.A. Answering Service under a lease arrangement with the owners Mr. and Mrs. Monk. The telephone answering service was located at 165 N. Williams Street, Bel Air, Maryland. The same address doubled as the Ottensmeyers' residence from April 1976 until March 26, 1979. In April 1978, the Ottensmeyers purchased the service from the Monks and became its sole owners.

The A.A. service was a traditional telephone service used primarily by medical and business professionals. Emergency and non-emergency messages were received and dispatched. By 1978, the Ottensmeyers employed 6–8 part-time employees to assist at the switchboard.

of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . .
Section 2 reads:
Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . .
The Ottensmeyers also asserted several pendent state claims (*e.g.*, malicious prosecution, malicious abuse of process, trespass) against the appellee.

In March 1978, Mr. Ottensmeyer wrote to Mr. Burke, a C & P sales representative, seeking verification and approval of a call diverter system. Mr. Ottensmeyer informed Mr. Burke that the diverter equipment would allow potential Washington Metropolitan customers to be diverted to a Baltimore exchange that connects to the A.A. Answering Service "[t]hereby extending the territory of the Answering Service to the Washington area." Mr. Ottensmeyer did not ask Mr. Burke whether the diverter equipment could also be used to provide A.A. customers with an alternative long-distance service. On March 6, 1978, Mr. Burke responded to Mr. Ottensmeyer's inquiry by stating "your device may be arranged as you have explained."

On April 21, 1978, Mr. Ottensmeyer wrote to the General Legal Counsel Division of the FCC regarding, *inter alia*, regulations governing non-toll long distance calls made with call diverter equipment. In its May 15th letter, the FCC emphasized "that the answers we are giving pertain to the interstate communication services subject to the jurisdiction of this Commission. As you may know, *we do not have jurisdiction over intrastate services* which are regulated by the various state regulatory agencies." (Emphasis added). The FCC also stated that "[b]ridging of incoming calls by a Telephone Answering Service to another number is permissible with respect to interstate service . . . but a company would have to be licensed to provide interstate communication services by reselling private-line service acquired from another common carrier."

**2.** C & P asserted a counterclaim against the Ottensmeyers under state law which alleged that the appellants were engaged in a scheme to defraud it of toll charges and other revenue. The counterclaim was asserted conditionally. If appellants' case were dismissed, the counterclaim was to be abandoned. The district court never formally dismissed C & P's counterclaim in its memorandum and order which disposed of appellants' antitrust action and pendent state claims. In order to clarify the status of the instant action, counsel for C & P, during oral argument, formally abandoned its counterclaim against the Ottensmeyers.

In August 1978, Ottensmeyer installed two C & P residential lines in a warehouse in Savage, Maryland. The two local lines were "patched" or interconnected, which allowed non-toll calls between parties in the Baltimore and Washington, D.C. areas. The calls would have normally been subject to long distance rates.

On September 28, 1978, a C & P installer-repairman reported installing a residential service in a warehouse district in Savage, Maryland. He also reported observing two other residential lines at that business location.

Mr. Tracy, of C & P's Rate and Tariff Department, notified Ottensmeyer by telephone that subscribing to residential service in a business location violated Maryland's tariff laws. From the phone conversation Tracy learned that Ottensmeyer was providing non-toll patched service to Baltimore-Washington customers. A C & P commercial manager sent four letters to Ottensmeyer confirming Tracy's phone conversation and informing Ottensmeyer that 1) the resale of telephone service [3] and 2) the maintenance of residential exchanges in an industrial district [4] violated Maryland's tariff laws and therefore his Savage, Maryland lines would be suspended on October 24, 1978. The service was in fact suspended on November 3, 1978. Ottensmeyer never responded to the four letters nor did he petition to the Maryland Public Service Commission (hereinafter P.S.C.) for relief.

At approximately the time that Ottensmeyer set up the patching service in Savage, Maryland, a similar patching service was established by him at 165 N. Williams Street, Bel Air, Maryland. The patched lines at Bel Air permitted customers to make non-toll calls anywhere from Cardiff, Maryland (or Delta, Pennsylvania—which had local calling access to Cardiff) to the Baltimore metropolitan area. Ottensmeyer advised prospective and actual customers using the Bel Air patching service that the service was lawful. Any customers having doubts about the legality of the long distance patching service were shown a copy of the FCC letter received by Ottensmeyer (as previously mentioned, the FCC letter passed no judgment on the legality of *intrastate* non-toll service). Ottensmeyer did not inform any customers of C & P's stated position regarding the patching of local telephone lines.

C & P soon learned that non-metered long distance calls were being made between Harford County, Maryland and Baltimore. As a result, Heil, a C & P Security Manager, conducted an investigation of Ottensmeyer's 165 N. Williams Street operation. Heil learned that ten *residential* phones, permitting service between Bel Air and Baltimore, were being used on AA's

---

**3.** The unauthorized use of telephone service provided to a customer by C & P, and receipt of compensation for such service, are governed by the General Regulations Tariff, P.S.C.-Md.-No. 201, Section 1, 1st Revised Page 8, F(1), "Limitations and Use of Service—Use of Customer's Service," which provides in pertinent part:

The use of service shall be restricted to the customer, his employees and representatives in the case of business service ... or the customer, his family and persons residing in the customer's household in the case of residence service, except as otherwise specified in the Telephone Company's applicable tariffs....

Service furnished by the Telephone Company is intended only for communications in which the customer has a direct interest and shall not be used for any purpose for which a payment or other compensation shall be received by him from any other person, firm or corporation for such use, or in the collection, transmission, or delivery of any communication for others, except as otherwise specified

in the Telephone Company's applicable tariffs.... (effective July 29, 1976).

**4.** The applicability of business or residence rates to telephone service provided by C & P is governed by Local Exchange Services Tariff, P.S.C.-Md.-No. 202, Section 1, 2nd Revised Page 1, which provides in pertinent part:

The determination as to whether customer service ... is furnished at business or residence rates is based on the location and character of use, made of the service ...

Service is classified and charged for as business service where the use is primarily or substantially of a business, professional, institutional or occupational nature ...

Service is classified and charged for as residence service where the primary use of the service is of a domestic nature and where the business use, if any, is merely incidental...

These provisions have been effective in accordance with an order of the Maryland P.S.C. since October, 1973.

premises.[5] As part of his investigation, he monitored the number of outgoing calls made on the ten residential lines. Heil discovered, for example, one of the residential phone lines subscribed to by Mr. Ottensmeyer's father carried 920 outgoing calls within a fifteen day period. The other numbers revealed similarly heavy "non-residential" use. Heil also made several test calls through the patching system, using the appellant's secret code, and confirmed the fact that intrastate calls could be made which avoided state tolling charges.

After Heil concluded his investigation, he informed a C & P attorney that he believed Ottensmeyer was defrauding C & P by using residential lines for business purposes.[6] He also informed the attorney about the long distance patching system.[7] After receiving Heil's report, the C & P attorney wrote to the Assistant State's Attorney for Harford County about the possible violations of Maryland's laws being committed by Ottensmeyer.[8]

Heil submitted, in response to a request from the Assistant State's Attorney for Harford County, his investigative findings to the Maryland State Police. The case was turned over to police officer Kelly. Kelly was specially trained in electronic surveillance techniques and telephone company operations. He conducted an independent investigation of the call diverting system stemming from 165 N. Williams Street. On the basis of his investigation, Kelly reasoned that "an illegal scheme is being employed by Gregory Ottensmeyer ... to defraud the C & P Telephone Co. of its duly earned long distance tariffs and that said fraud is being conducted ... with an illegal telephone device which 'cross connects' or 'patches' these dialing areas."

Kelly accordingly applied to Judge Albert P. Close of the Circuit Court, Harford County, Maryland, for a search warrant. In his affidavit, Kelly informed the judge of his experience in the electronic field and of his independent investigation and conclusions.[9] Judge Close issued a warrant that "commanded" the Maryland State Police, "with the necessary and proper assistance,

---

5. Ten *residential* phone lines used on A.A.'s premises permitting service between Bel Air and Baltimore were held in the following names: 2 lines in the name of Walter Ottensmeyer (Mr. Ottensmeyer's father), 2 lines in the name of Beryl Franklin (Mr. Ottensmeyer's business associate), 2 lines in the name of Mr. Ottensmeyer, 3 lines in the name of Mrs. Ottensmeyer, and 1 line in the name of Louise Obrecht (an A.A. former employee). Only Mr. and Mrs. Ottensmeyer, however, actually resided at 165 N. Williams Street. The residential service for these exchanges was cheaper than the business service.

6. During Heil's investigation, C & P employees visited 165 N. Williams Street regularly to make repair calls and to connect and disconnect lines. During these repair calls C & P employees had full access to C & P's equipment, including the call diverter equipment. C & P employees did not give any indication to the Ottensmeyers that the call diverter equipment was prohibited.

7. Heil admitted that he made no attempt to notify Mr. Ottensmeyer about his investigation and findings nor did he ask Mr. Ottensmeyer to break down the percentage of calls being made interstate and intrastate.

8. The C & P attorney was already familiar with the facts surrounding the suspension of service at the Savage, Maryland warehouse.

9. In his Application and Affidavit for Search and Seizure Warrant, Officer Kelly concluded that there was probable cause to believe that the Ottensmeyers were violating Art. 27, §§ 557A, 194A of the Annotated Code of Maryland (1957 edition):

§ 557A. **Devices designed or used to avoid payment of charges.**
It is unlawful for any person knowingly to make, sell, offer or advertise for sale, possess, or give or otherwise transfer to another any instrument, apparatus, equipment, or device or plans or instructions for making or assembling any instrument, apparatus, equipment, or device which has been designed, adapted, used, or employed with the intent or for the purpose of (1) obtaining telephone or telegraph service or the transmission of a message, signal, or other communication by telephone or telegraph, or over telephone or telegraph facilities, without the payment of charges therefor; or (2) concealing or assisting another to conceal from any supplier of telephone or telegraph service or from any person charged with the responsibility of enforcing this section, the existence or place of origin or of destination of any message, signal, or other communication by telephone or telegraph, or over telephone or telegraph facilities.

including C & P Telephone personnel," to enter the premises at 165 N. Williams Street and conduct the authorized search and seizure.

The search was executed on March 26, 1979. The police were accompanied by Heil and other C & P personnel. The search lasted approximately six hours. Records and patching/diverter equipment were seized.

Following the search, the C & P attorney authorized the sending of a letter to Ottensmeyer notifying him that his telephone services would be suspended due to contravention of Maryland's tariffs.[10] On April 17, 1979, Ottensmeyer's attorney requested an informal conference with the P.S.C. to discuss the termination of A.A.'s telephone service. A meeting was held on April 26 between Ottensmeyer's attorney and the attorney for C & P.

■ Appellants' counsel inquired as to whether an agreement could be structured which would permit the continuation of A.A.'s telephone services. C & P and appellants' attorney agreed that A.A. could continue to offer traditional telephone answering service provided that Mr. Ottensmeyer was not involved in the operation ("Agreement").[11] As a result, the A.A. Answering Service was leased to Mrs. O'Brien, Mr. Ottensmeyer's mother, and Mr. Ottensmeyer moved from the premises at 165 N. Williams Street.

## II

While the Supreme Court has warned that "summary procedures should be used

§ 19A. **Tampering, etc., with equipment; use of tricks, impersonation, etc.**

It shall be unlawful for any person or persons to obtain any telephone services, whether local or long distance, or both, from any telephone company, or any firm or private person with intent to cheat or defraud such telephone company, other firm or private person, by installing, rearranging, or tampering with any facilities or equipment, or by any trick, stratagem, impersonation, pretension, falsification of fact, or contrivance, or by any other device or means whatsoever. Any person or persons found guilty of a violation of any of the provisions of this section shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be imprisoned not exceeding six months or fined not exceeding five hundred dollars, or both, in the discretion of the court.

(§ 194A was repealed by Acts 1978, Ch. 849, § 4 effective July 1, 1979).

10. General Regulations Tariff, P.S.C.-Md.-No. 201 Section 1, 4th Revised Page 9 states in pertinent part:

F. LIMITATIONS AND USE OF SERVICE (Cont'd)

3. Cancellation for Cause

The Telephone Company may, without incurring any liability, either suspend or terminate the service for any of the following reasons:

\* \* \* \* \* \*

i. Abuse or fraudulent use of service. Abuse or fraudulent use of service includes:

(1) The use of service or facilities of the Telephone Company to transmit a message or to locate a person or otherwise to give or obtain information, without payment of an applicable charge;

(2) The obtaining, or attempting to obtain, or assisting another to obtain or to attempt to obtain telephone service, by rearranging, tampering with, or making connection with any facilities of the Telephone Company, or by any trick, scheme, false representation, or false credit device, or by or through any other fraudulent means or device whatsoever, with intent to avoid the payment, in whole or in part, of the established charge for such service.

11. In addition to their claim for damages, the appellants sought preliminary and permanent injunctive relief which would essentially prohibit the enforcement of the Agreement reached between appellants' attorney and C & P. The theory for the injunctive relief apparently rested on the fact that such an agreement was an unlawful restraint of trade or attempt to monopolize telephone services within Maryland. After eight days of hearings on the motion for a preliminary injunction, the district court ordered that appellants' request be denied. No appeal was taken by the appellants on that issue.

Given that C & P had the authority to completely terminate AA's service for failure to comply with Maryland's tariff laws, it is difficult to imagine how the compromise C & P agreed to— i.e., allowing AA's services to continue on condition that Mr. Ottensmeyer did not participate in its operations—constitutes an illegal restraint of trade. Suffice it to say, that the appellants § 2 claim based on the Agreement lacks merit.

It should be noted that C & P has stipulated that it will release Mr. Ottensmeyer from the terms of the Agreement inhibiting his involvement at the end of the present litigation if Mr. Ottensmeyer agrees to comply with Maryland's tariffs.

sparingly in complex antitrust litigation," *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), it has also acknowledged the propriety of granting summary judgment in limited instances. "While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint." *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). Thus, when antitrust allegations are mere "window dressing" or are simply thrown in as a shotgun approach for relief, we have granted a defendant's motion for summary judgment. *See, e.g., Universal Lite Distributors, Inc. v. Northwest Industries, Inc.*, 452 F.Supp. 1206, 1210–1211 (D.Md.1978), *affirmed,* 602 F.2d 1173, 1175 (1979).

▆▆▆ In granting summary judgment in favor of the appellees on the appellants' § 1 claim, the district court emphasized the glaring lack of evidence suggesting a conspiracy between C & P and AT & T. The existence of a conspiracy is critical to a § 1 claim. *See Murdaugh Volkswagen, Inc. v. First National Bank of South Carolina*, 639 F.2d 1073, 1075 (4th Cir.1981) ("what is dispositive is the utter failure of plaintiff to show that the two defendants either *conspired* or acted *jointly* to injure the [plaintiffs]") (emphasis in original). In viewing the appellants' case as the trial court did on the appellees' motion for summary judg-

ment [12]—*i.e.*, by drawing all inferences in the light most favorable to the party opposing the motion for summary judgment—we must agree with the district court that the appellants failed to present a genuine issue as to the existence of a conspiracy or "combination" within the meaning of § 1. The appellants simply made conclusory assertions of conspiratorial conduct. There was absolutely nothing in the record to suggest that C & P and AT & T acted in combination to have the appellants' premises searched or their answering service terminated.

In granting summary judgment in favor of the appellees on appellants' § 2 monopolization claim, the district court relied heavily on a recent extension of the *Noerr-Pennington* doctrine. Essentially, in their § 2 claim, the appellants were arguing that C & P's complaint to the Maryland State Police and the resulting search and seizure constituted an unreasonable anti-competitive act which simply served to further C & P's own monopolistic position in the long distance telephone market. The Supreme Court, however, has limited the reach of § 1 and § 2 by immunizing anti-competitive conduct undertaken to persuade or petition government entities, or to utilize judicial or quasi-judicial mechanisms." The grant of immunization has come to be called the *Noerr-Pennington* doctrine. The two Supreme Court cases which gave rise to the doctrine are *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).[13]

---

**12.** The appellate court must search the record to determine whether there is a genuine issue as to any material fact. "The general standard that an appellate court applies in reviewing the grant or denial of a summary judgment motion is the same as that employed by the trial court initially under Rule 56(c) ...." *See* 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure, § 2716 at 643.

**13.** In *Noerr,* the lobbying and publicity campaign launched by a group of railroads to foster the adoption and retention of certain state laws

injurious to the trucking business was held not to be violative of the Sherman Act. Likewise, in *Pennington,* the attempts by large coal companies to secure favorable action from the Secretary of Labor—action which would be injurious to smaller coal producers—was held not to constitute an antitrust violation. *Pennington* emphasized that communications directed at executive officials or agencies—in contrast to the legislative and publicity efforts involved in *Noerr*—were protected.

Another case frequently cited when discussing the *Noerr-Pennington* doctrine is *California Mo-*

The policies behind the *Noerr-Pennington* doctrine include preserving an individual's first amendment right to petition government officials and encouraging the free flow of ideas to political bodies in order to ensure intelligent decisionmaking. The Supreme Court in *Noerr* noted that, if attempts to influence the passage and enforcement of laws were not protected, the Sherman Act would regulate "political activity" and not "business activity." Even if people or business entities petition their legislators with anticompetitive intent, their .conduct is still protected under the doctrine. The Supreme Court realistically concluded that people who lobby before their representatives usually, if not always, are seeking to further their own interests at the expense of others. It is the legislators' duty then to act as the ultimate arbiters of what serves the public interest.

There are, not surprisingly, some constraints upon the *Noerr-Pennington* doctrine's grant of immunity. The Court in *Noerr* stressed that if the publicity campaign or lobbying effort were a "mere sham" intended to obfuscate "what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor" the party would be held in violation of the Sherman Act. 365 U.S. at 144, 81 S.Ct. at 533.

The *Noerr-Pennington* doctrine has recently been extended to include information given to police which leads to anti-competitive consequences. *See Forro Precision, Inc. v. International Business Machines Corp.*, 673 F.2d 1045, 1059–1060 (9th Cir. 1982). Before *Forro*, the doctrine had

been limited to communications within a legislative, administrative or judicial forum and to communications directed at executive officials or agencies.

The facts in *Forro*, to some degree, parallel the instant case. IBM developed a new disk storage device. It discovered that its security had been violated and that the new design was prematurely "out" on the market. IBM suspected Forro and other enterprises of trade secret thievery and approached law enforcement officials about the matter. A warrant was issued to search the Forro facility as well as several other locations. IBM officials accompanied and assisted the San Jose police during the search at the Forro plant. Drawings, price lists and other records were seized. The search lasted twelve hours. It was widely publicized in computer trade journals. No indictment was ever sought against Forro. The court in *Forro* held that "IBM's invocation of police assistance, which resulted in an investigation and a search of Forro's plant, may not serve as the basis of an antitrust claim because these actions are accorded immunity." *Id.* at 1058.

The court, in deeming IBM's actions immune from liability under the Sherman Act, acknowledged that communications to police do not constitute the type of "political activity" protected by the *Noerr-Pennington* doctrine. However, the court in *Forro* noted that "the public policies served by ensuring the free flow of information to the police" were equally as strong as the policies served by the *Noerr-Pennington* doctrine. *Id.* at 1060. Specifically, the Ninth Circuit found that the police would

---

tor *Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). *California Motor Transport* expanded the *Noerr-Pennington* doctrine to include administrative and adjudicative proceedings. *California Motor Transport* not only extended the applicability of the doctrine but it also unequivocally articulated its constitutional underpinnings. In *Noerr*, while the Supreme Court recognized that the failure to grant immunity for the conduct in question "would raise important constitutional questions," 365 U.S. at 137–138, 81 S.Ct. at 529–530, the Court actually rested its decision on

principles of statutory construction. That is, the Court simply held that the Act did not apply to the "mere solicitation of government action." 365 U.S. at 138, 81 S.Ct. at 530. However, the Court in *California Motor Transport* squarely held that first amendment rights of petition and association would be violated if groups could not "use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests *vis-a-vis* their competitors." 404 U.S. at 510–511, 92 S.Ct. at 611–612.

be handicapped in protecting the public if people feared that information offered to officials would give rise to an antitrust violation; that is, there would be a "chilling effect" on information given to police if the Sherman Act hovered ominously overhead. The court in *Forro* addressed the *sham* exception originated in *Noerr* and noted that:

> If, in the case before us, IBM had provided the police with deliberately false information, *solely* for the purpose of harassing Forro or of achieving other ends unrelated to law enforcement, its conduct would unquestionably come within the sham exception.

*Id.* at 1060 (emphasis added).

 Based on the first amendment concerns enunciated in *Noerr* and its progeny, we agree with the district court that *Forro* is a logical, proper extension of the *Noerr-Pennington* doctrine. The "sham" exception still applies and therefore provides a necessary safeguard against abusing the privilege of immunity. We further agree with the district court that the sham exception is inapplicable in the instant case—especially in light of police officer Kelly's expertise in telephone operations and independent assertion of wrongdoing. In other words, Kelly's independent investigation, which supported his affidavit for a search warrant, effectively nullified any allegations of a sham on the part of C & P. Thus, C & P's communications with the police and the subsequent search and seizure were not acts in violation of the Sherman Act. As a result, the appellants' antitrust claims must fail as a matter of law.[14]

AFFIRMED.

---

14. In addition to entering summary judgment in favor of the appellees, the district court dismissed the appellants' pendent state claims for want of jurisdiction. The appellants contended that dismissal was improper especially since the statute of limitations on their state claims had run during the pendency of their federal action. However, there is no rule whereby district courts must exercise jurisdiction over time-barred state claims. Whether a trial court chooses to relinquish jurisdiction over time-barred state claims is a matter left to its sound discretion. *United Mine Workers v. Gibbs*, 383 U.S. 715, 727–729, 86 S.Ct. 1130, 1139–1141, 16 L.Ed.2d 218 (1966). There has been no showing that the trial judge abused his discretion in the instant case.