John O. VARTAN, Plaintiff,

v.

HARRISTOWN DEVELOPMENT COR-
PORATION and William Keisling, De-
fendants and Third-Party Plaintiffs,

v.

CITY OF HARRISBURG, Bernard Ham-
mer, Harrisburg Redevelopment Au-
thority, and Stephen R. Reed, Third-
Party Defendants.

Civ. A. No. 84–1395.

United States District Court,
M.D. Pennsylvania.

March 13, 1987.

Patrick T. Ryan, Drinker, Biddle &
Reath, Philadelphia, Pa., N. Timothy Guar-
neschelli, Joseph A. Klein, Harrisburg, Pa.,
for plaintiff.

Eugene E. Pepinsky, Jr., Wayne M.
Pecht, Harrisburg, Pa., for Hamilton Bank.

Bruce F. Bratton, Connelly, Martsolf,
Reid, Bratton & Spade, Harrisburg, Pa.,
for Hammer and Harrisburg Redevelop-
ment Authority.

Judith B. Schimmel and Jack Hardy, Har-
risburg, Pa., for City of Harrisburg and
Stephen R. Reed.

Stuart J. Magdule, Solicitor, Harrisburg,
Pa., for Redevelopment Authority and
Hammer.

Francis B. Haas, Jr., F. Murray Bryan,
McNees, Wallace & Nurick, Harrisburg,
Pa., and Lewis Bernstein, P.C., Thomas E.
Silfen, Arnold & Porter, Washington, D.C.,
for Harristown Development and Keisling.

## MEMORANDUM

CALDWELL, District Judge.

### I. *Introduction.*

Defendants, Harristown Development
Corporation (Corporation) and William
Keisling, have filed a motion for summary
judgment. Plaintiff, John O. Vartan, filed
this lawsuit against the moving defendants
as well as the City of Harrisburg, the Har-
risburg Redevelopment Authority (HRA),
HRA's chairman, Bernard Hammer, and
Harrisburg's mayor, Stephen R. Reed.[1]
Vartan alleged that the defendants had
conspired to monopolize or restrain trade in
the redevelopment of downtown Harris-
burg in violation of the Sherman Act, 15
U.S.C. §§ 1 and 2, and the Clayton Act, 15
U.S.C. § 14. Pursuant to 42 U.S.C. § 1983,
he also claimed the defendants violated his
fourteenth amendment due process rights.
Finally, he asserted several pendent state
claims.

---

1. Subsequent to the filing of the suit, the latter
defendants settled with plaintiff. They were
then brought into the action as third-party de-
fendants by the moving defendants.

The request for summary judgment is based upon the inapplicability of the antitrust laws to conduct taken under state authority. Defendants also assert that no civil rights claim can be made as a matter of law. We will examine the motion under the standard recently set forth in *Anderson v. Liberty Lobby, Inc.,* ––– U.S. –––, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See also Michelson v. Exxon Research and Engineering Co.,* 808 F.2d 1005 (3d Cir. 1987).

## II. *Background.*

The following is the background of this litigation, gleaned from the undisputed statements of material fact, depositions in this action, deposition and trial testimony from a companion state court action, and documentary exhibits submitted by the parties.

On October 8, 1974, pursuant to the Pennsylvania Urban Redevelopment Law, the Act of May 24, 1945, P.L. 991, § 1 *et seq.,* 35 P.S. § 1701 *et seq.* (Purdon & Purdon Supp.1986), the Harrisburg City Council approved the Harristown Urban Renewal Plan (Plan). The Plan provided a comprehensive program for the renewal of downtown Harrisburg. It contemplated that certain properties would be acquired by redevelopment authorities and designated for certain uses.

In 1984, one of the principal focuses of the Harrisburg redevelopment authorities was the creation of a hotel and office building complex on the historic Market Square in downtown Harrisburg.[2] A private developer, Pattison Partners, had become involved in the project and Harrisburg had submitted an application for an Urban Development Action Grant (UDAG) to the federal government on January 31, 1984. A final application was to be submitted by June 1, 1984. Two state agencies, the Public School Employees Retirement System (PSERS) and the State Employees Retirement System (SERS) were being sought as tenants for the proposed project.

In December 1983, Vartan, who had previously built low rise office buildings in suburban Harrisburg, decided to build a high rise building in the downtown area. Vartan intended to pursue PSERS and SERS as tenants. In February and March 1984, he discussed with Mayor Reed the possibility of developing a piece of property within the area of the Plan located at Fifth and Walnut Streets (the Walnut Street site). This site had originally been owned by the City but legal title was now in HRA with the City retaining beneficial ownership. There was no planned use for it. Mayor Reed at first expressed interest in having Vartan develop the site but by letter, dated April 17, 1984, he informed Vartan that the City could not support his planned development of the Walnut Street site for the following reasons:

I do believe that it is not in the interests of the City for both you and the hotel developer to be competing for the same certain public leases as the effect of that would be to either make the hotel project or possibly both of your projects weakened.

It is expected that by June 1, 1984, most aspects of the hotel project will have been completed for purposes of the less than market interest rate UDAG financing package.

In the meanwhile, I see no reason why you should not proceed with plans for development of the 5th and Walnut Street site for those office, retail and residential activities that do not have the direct undermining impact that I have written of regarding the hotel. There is no question that following the start-up of the hotel project that your project should be prepared or ready to go on line.

Similar sentiments were expressed by defendant Hammer in a letter, dated April 12, 1984, in which he informed Vartan that HRA could not assist him at that time in developing the Walnut Street site because of the importance of the hotel and office building project, a "Number One" priority

---

**2.** Harrisburg redevelopment authorities include the City, acting through the Mayor, HRA and the Corporation, although we recognize that

Vartan would not accept the Corporation as being an "authority" legally capable of exercising any influence on redevelopment.

for the administration. Hammer felt that "it would be irresponsible for HRA to initiate any new projects that may confuse or impair efforts of the development team and the administration to secure" prelease commitments of office·space, including commitments from Commonwealth agencies. Hammer did offer to cooperate with Vartan in helping him with another project that would be "consistent with downtown development needs and local design and site utilization controls."

These communications were consistent with the consensus at a breakfast meeting held on April 4, 1984 among principals active in the redevelopment of Harrisburg. It was felt that Vartan's intended use of the Walnut Street site would compete with the hotel and office building project.

After this failure, in August 1984, Vartan purchased two adjacent properties in downtown Harrisburg, one on Chestnut and Court Streets and the other on Blackberry Street (hereinafter, collectively "the Chestnut Street site"). Vartan knew that this site had been on the list of properties to be acquired under the Plan and had been designated on the Plan to be used for a parking garage. Vartan announced his intention to build an office building on this property.

Reed, Hammer and Keisling met on August 21, 1984. Keisling's letter agenda for the meeting included discussing Vartan's recent purchase of the Chestnut Street site and its impact on redevelopment in Harrisburg. The agenda stated:

> Of immediate concern is the fate of properties on Chestnut Street, the use of which is specified in the Urban Renewal Plan for an additional parking garage. Recent public announcements (made, as far as I know, without consultation with any of the parties to the Agreement) threaten the loss forever of what could be critical parking facilities if the downtown is to continue its rejuvenation. The unplanned use of part of the site for an office building will also play havoc with difficult market absorption problems which must be faced if the Third and Walnut office site is to be redeveloped

and create the long-needed spin-off effects contemplated by the Urban Renewal Plan.

At the meeting, Mayor Reed, Keisling and Hammer unanimously decided to acquire Vartan's property. Mayor Reed testified that Keisling was "very persuasive" in arguing for acquisition concerning the issue of "market absorption" and the "integrity of the plan," among other things. Although Hammer had some "reservations" about saying no to a private developer who intended to use his own funds to develop a privately owned site, he also concurred in the decision to condemn Vartan's property. The meeting was held and the decision made pursuant to a cooperation agreement, discussed below. A letter, dated August 24, 1984, to the members of HRA, the board of directors of the Corporation and to the members of the Harrisburg Parking Authority, announced this decision and requested that the Corporation provide the funding so that HRA could acquire Vartan's property.

Thereafter, before a declaration of taking could be filed, Vartan filed this lawsuit and a companion case in state court, *Vartan v. Reed*, 106 Dauphin Co. Rep. 87 (1985), *rev'd*, —— Pa.Commw. ——, 514 ·A.2d 646 (1986). The state court suit sought to enjoin the threatened condemnation. The trial court granted that relief but the commonwealth court reversed. To date, the Chestnut Street site has not·been condemned.

### III. *Discussion.*

A. *The Clayton Act And Sherman Act Do Not Apply To Keisling and The Corporation Because of the State Action Doctrine.*

Keisling and the Corporation argue that they are protected from antitrust liability by the state action doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). They cite the recent discussions of the state action doctrine in *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985) and *Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48,

105 S.Ct. 1721, 85 L.Ed.2d 36 (1985) in their support. *Hallie* and *Southern Motor Carriers* clarified when the state action doctrine could be invoked by either a municipality or a private party. *See Englert v. City of McKeesport,* 637 F.Supp. 930 (W.D.Pa.1986).[3] In *Hallie,* the Supreme Court held that a municipality could claim exemption from the antitrust laws if it engaged in the challenged activity "pursuant to a clearly expressed state policy." *Id.,* 471 U.S. at 40, 105 S.Ct. at 1717, 85 L.Ed.2d at 30. In *Southern Motor Carriers,* the Court held that private parties could escape antitrust liability by showing, in addition to the above, that the state actively supervised any private anticompetitive conduct.

Defendants first claim that the Corporation is not a private entity and only has to satisfy the first requirement. Accordingly, since the challenged actions were undertaken pursuant to the Urban Redevelopment Law, and hence pursuant to a clearly expressed state policy, the Corporation, and Keisling acting on its behalf, are immune from antitrust liability. Second, defendants argue that even if the Corporation is considered a private entity, its conduct was actively supervised by HRA and the City, state actors for the purposes of the antitrust exemption. Therefore, the second requirement has been fulfilled and immunity still applies.

Plaintiff contests that either requirement has been satisfied here. First, he argues that the Urban Redevelopment Law did not authorize the anticompetitive actions undertaken by the redevelopment authorities. Further, refusing to concede that the corporation is a public entity, Vartan asserts that the second requirement has not been satisfied because agreements entered into over the years by the City, HRA and the Corporation illegally transferred control of redevelopment in downtown Harrisburg to the Corporation. There has thus been no active supervision by the state and Vartan may proceed with his antitrust claims.

1. *The Challenged Activity Has Been Engaged In Pursuant to a Clearly Expressed State Policy Which Contemplated That Anticompetitive Activities Would Occur.*

The Pennsylvania General Assembly set forth the following findings in the Urban Redevelopment Law. Urban communities within the Commonwealth contain blighted areas because of inadequate planning. 35 P.S. § 1702(a). These conditions cannot be dealt with by private enterprise alone. Some areas would require total acquisition, clearance and disposition subject to the controls set forth in the Law. Other areas could be rehabilitated or partially cleared and partially rehabilitated. *Id.* at § 1702(c) and (c.1). Further, it was specifically found that "replanning and redevelopment of such areas in accordance with sound and approved plans for their redevelopment will promote the public health, safety, convenience and welfare." *Id.* at § 1702(d). Accordingly, it was "declared to be the policy of the Commonwealth of Pennsylvania to promote the health, safety and welfare of the inhabitants thereof by the creation of bodies corporate and politic to be known as Redevelopment Authorities...." *Id.* at § 1702(g). These authorities would eliminate blighted areas "in conformity with the comprehensive general plans of their respective municipalities for residential, recreational, commercial, industrial or other purposes...." *Id.* The power of eminent domain could be used to fulfill these goals. *Id.*

Authorities were created for each city and county in the Commonwealth but became operative and entitled to transact business only after the governmental body so found by appropriate legislation. *Id.* at § 1704. Each authority has the power, among other things: to study the recommendations of the planning commission for redevelopment of any area and to make its own additional studies; to own, hold, clear and manage real property; and to acquire by eminent domain any real property for

---

**3.** Defendants have not argued that the Local Government Antitrust Act of 1984, 15 U.S.C. § 34 *et seq.* should apply here. We would agree that it would not, based upon the antitrust provisions cited by plaintiff and the relief requested.

the purposes set forth in the Law. *Id.* at § 1709.

Plaintiff, in asserting that the first requirement is not satisfied, argues that the standard to be applied is whether the state enabling legislation authorized the precise sort of activity challenged here and intended that it be permitted. The challenged restraint must be necessary to the successful operation of the legislative scheme. In plaintiff's view, the defendants' activities here fail this test because the Pennsylvania legislation does not authorize general displacement of competition. The only specific statement of a goal is to assist private redevelopment. 35 P.S. § 1702(c). Plaintiff concedes that certain anticompetitive actions may take place as a result of pursuing that goal such as the taking of property by eminent domain but general displacement of competition was not necessary to the operation of the legislative scheme which, properly construed, was intended to coordinate and encourage private redevelopment. Vartan points out that redevelopment authorities could not operate until empowered by local governmental bodies. Hence, authorities were not necessary to the carrying out of state law. He relies upon *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982), to establish that the Urban Redevelopment Law is neutral on the precise method to be used to accomplish redevelopment and cannot shield Keisling's and the Corporation's actions here.

*Community Communications* is easily distinguishable. In that case, Colorado's constitution conferred upon the City of Boulder "home rule" powers, entitling the City to exercise "the full right of self-government in both local and municipal matters." *Id.* at 43, 102 S.Ct. at 836, 70 L.Ed.2d at 814. Petitioner, Community Communications, challenged a local regulation of cable television on antitrust grounds. The Supreme Court rejected the City's argument that it had state action immunity based upon the home rule powers conferred by the Colorado constitution. The Court stated:

A State that allows its municipalities to do as they please can hardly be said to

have "contemplated" the specific anti-competitive actions for which municipal liability is sought. Nor can those actions be truly described as "comprehended within the powers *granted,*" since the term, "granted," necessarily implies an affirmative addressing of the subject by the State. The State did not do so here: The relationship of the State of Colorado to Boulder's moratorium ordinance is one of precise neutrality. As the majority in the Court of Appeals below acknowledged: "[W]e are here concerned with City action in the absence of any regulation whatever by the State of Colorado. Under these circumstances there is no interaction of state and local regulation. We have only the action or exercise of authority by the City."

*Id.* at 55, 102 S.Ct. at 843, 70 L.Ed.2d at 821 (emphasis in original) (brackets in original).

The situation here is different. The Commonwealth has affirmatively addressed the specific subject of urban redevelopment and the City of Harrisburg has acted pursuant to the statutory authorization. Accordingly, *Community Communications* has no relevance here. *See LaSalle National Bank of Chicago v. County of DuPage,* 777 F.2d 377 (7th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 2892, 90 L.Ed.2d 979 (1986); *Reasor v. City of Norfolk,* 606 F.Supp. 788 (E.D.Va.1984).

Additionally, we believe that the standard plaintiff is applying to the state legislation is far too strict in light of *Hallie* and *Southern Motor Carriers, supra.* Plaintiff's position, that the defendants' precise actions must have been contemplated by the state and necessary to the successful operation of the state scheme before their actions can be immunized under the state action doctrine, may have had support in the case law before *Hallie* and *Southern Motor Carriers,* but cannot be accepted now. Under *Hallie,* the legislation does not have to authorize specifically anticompetitive conduct. It is sufficient if "[s]uch conduct is a foreseeable result" of empowering the city to redevelop certain areas it has determined are blighted. *Id.,* 471 U.S.

at 42, 105 S.Ct. at 1718, 85 L.Ed.2d at 31 (brackets added). In other words, if anticompetitive effects would logically result from the broad authority conferred upon the City to redevelop, the state has authorized the conduct and the first requirement has been satisfied. *Id.* at 41–43, 105 S.Ct. at 1718, 85 L.Ed.2d at 31.

We have no doubt that the Urban Redevelopment Law has that effect. The Commonwealth has empowered municipalities to adopt plans for the redevelopment of decaying areas. It must have been contemplated that, in pursuing a plan, a municipality would on occasion act to prevent private development to maintain what it perceived to be the integrity of the plan. *See Jonnet Development Corp. v. Caliguiri,* 558 F.Supp. 962 (W.D.Pa.1983). Similar redevelopment laws in other jurisdictions have been recognized to contemplate anticompetitive actions on the part of governmental bodies. *See Cine 42nd Street Theater Corp. v. Nederlander Organization, Inc.,* 790 F.2d 1032 (2d Cir.1986); *Scott v. Sioux City,* 736 F.2d 1207 (8th Cir.1984), *cert. denied,* 471 U.S. 1003, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985). The cases cited by plaintiff on pages 50–51 of his brief in opposition are distinguishable.

We cannot agree with plaintiff that the optional nature of the Law means that the Commonwealth did not authorize defendants' conduct. The same claim was raised in *Preferred Communications, Inc. v. City of Los Angeles,* 754 F.2d 1396 (9th Cir.1985), *aff'd on other grounds,* — U.S. —, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986), in an antitrust attack upon a city television cable franchise ordinance granting exclusive franchises in certain parts of the city. The California statute at issue there did not require a city to pass an ordinance. It merely authorized such local legislation. Plaintiff cable operator relied upon this, in part, to argue that the exclusiveness of the franchise was a city policy rather than a state policy. Hence, its antitrust claim was not barred. The court of appeals concluded that the discretion granted to the municipality did not strip it of state action immunity because specific, detailed legislative authorization was not required. The Court stated:

> Section 53066 expressly notes that cities *"may* authorize the [franchisee or licensee] to place wires, conduits, and appurtenances ... along or across streets, highways, alleys, public properties, or public easements," indicating the legislature's awareness that it was delegating regulatory authority to deal with the burden placed on public resources by cable television. That some cities, to minimize the disruption of public resources, might limit the number of cable providers seems to us to constitute at least a reasonable consequence of their engaging in the authorized regulatory activity. This possibility surely was in the contemplation of the legislature when it enacted section 53066. Accordingly, we conclude that the City acted pursuant to a "clearly articulated and affirmatively expressed" state policy to displace competition with regulation.

*Id.* at 1414–15 (brackets in original) (emphasis added).

This conclusion applies with even greater force to the case at bar. In *Preferred Communications,* plaintiff had accepted that the state legislation had authorized local control of cable television and was only contesting defendant's grant of exclusive franchises as following from the state law. In the instant case, plaintiff is not even willing to concede that one consequence of the Urban Redevelopment Law is that a locality would adopt a redevelopment plan and make the findings necessary to make a redevelopment authority operative, despite the grant of authority to do so by the Commonwealth. We find this argument without merit.

Vartan further argues that, even if Pennsylvania had intended to allow displacement of competition, it certainly did not authorize the organization which eventually controlled development in downtown Harrisburg. Vartan claims that the Corporation, originally created to assist HRA in carrying out the redevelopment plan, has through a series of agreements, actually come to control HRA and redevelopment.

This arrangement was not anticipated or authorized by the legislature. The Urban Redevelopment Law clearly contemplated that a public body, a redevelopment authority like HRA, would control redevelopment, not a private entity like the Corporation.

A review of the agreements referred to by plaintiff indicates that Vartan is not exaggerating the extent to which the Corporation has seized the initiative on redevelopment in Harrisburg.[4] An example is the Cooperation Agreement of June 27, 1984. That Agreement reviews the parties' difficulties in harmoniously executing the redevelopment plan, and the litigation between the Corporation and HRA. It then provides a procedure for pursuing redevelopment. Briefly, in part, the Agreement provides that the Corporation shall recommend which properties, already acquired, shall be offered for redevelopment. Three representatives, the mayor on behalf of the City, a representative from HRA and a representative from the Corporation, shall meet to approve the recommended disposition. If the representatives cannot unanimously agree, disposition of the property can be held in abeyance or, at the request of any representative, a panel of three private arbitrators can decide the issue. Under the Land Assembly Agreement of May 28, 1976, the Corporation recommends which properties are to be acquired, in accordance with the Plan, and HRA can accept or reject the recommendation. If the recommendation is accepted, HRA prepares a budget for the acquisition of the property which must be approved by the Corporation. The agreement also provides that the Corporation can recommend a use for acquired property. If approved by HRA, HRA shall convey the property to the private persons chosen to develop the property. Finally, the Agreement places all public monies in the Corporation's control.

Plaintiff points out other agreements which he contends are illegal under the Law. The above discussion, however, illustrates plaintiff's argument. The Urban Redevelopment Law places the responsibility upon HRA to control redevelopment. But the above provisions place control in the Corporation. Under them, HRA can only review decisions made by the Corporation which decides what properties to acquire and to what use they should be put.

However, for the purposes of the application of the antitrust laws, we will not inquire into the alleged illegality of the several agreements between HRA, the City and the Corporation. As stated by the court in *Llewellyn v. Crothers*, 765 F.2d 769, 774 (9th Cir.1985) (brackets added):

> [T]he theoretical underpinning for the *Parker* doctrine is the Supreme Court's pronouncement that the Sherman Act was not intended to reach the activities of state governments. A state's antitrust immunity springs from an essential principle of federalism, the necessity to respect a sovereign capacity in the several states. [*Hoover v.*] *Ronwin*, [466 U.S. 558] 104 S.Ct. [1989] at 1995–96 [80 L.Ed.2d 590]. Given this purpose, it follows that actions otherwise immune should not forfeit that protection merely because the state's attempted exercise of its power is imperfect in execution under its own law.
>
> State laws intended to displace the antitrust laws may delegate to public agencies or officials the power to act, decide, or regulate in order to achieve anticompetitive results. Of course, state law "authorizes" only agency decisions that are substantively and procedurally correct. Errors of fact, law or judgment by the agency are not "authorized," and state tribunals will normally reverse erroneous acts or decisions. If the antitrust court demands unqualified "authority" in this sense, it will inevitably become the standard reviewer of governmental agencies whenever it is alleged that the agency, though possessing the power to engage in the challenged conduct, has exercised its power erroneously.

---

**4.** Two suits were filed in state court between the Corporation and HRA which litigated the validity of the contractual arrangements.

Areeda, *Antitrust Immunity for "State Action" After Lafayette,* 95 Harv.L.Rev. 435, 449–50 (1981). " 'Ordinary' errors or abuses in the administration of powers conferred by the state should be left for state tribunals to control." *Id.* at 453. A contrary rule would tempt aggrieved parties to forego available state corrective processes in hopes of obtaining the treble damages remedy conferred by the Sherman Act. Here state corrective processes were available, and the aggrieved parties could resort to them.

This analysis applies here. HRA's delegation of authority may have been illegal under state law but that would not expose defendants to antitrust liability. The conduct was a logical consequence of the Urban Redevelopment Law and designed to implement that Law. None of the entities involved in Harrisburg's redevelopment should be exposed to antitrust liability because the particulars of their arrangement may violate state law. Further, in regard to the blocking of Vartan's development of the Chestnut Street site, a state corrective process was available. As discussed more fully below, Vartan could have forced a condemnation and presented his objections to the state court.

We conclude that the first requirement of the *Parker* state action doctrine has been satisfied here.

2. *The City and HRA Actively Supervised The Corporation And the Second Requirement Has Been Satisfied.*

Keisling and the Corporation argue that the Corporation is a public entity and does not have to satisfy the active state supervision requirement. We will not address this issue because we agree with defendants that, in any event, the City and HRA passed upon and approved the actions of the Corporation in connection with Vartan's failed attempts to develop in the downtown area. Accordingly, even if the Corporation is considered a private entity, it is not liable for any antitrust violations.

In connection with the Chestnut Street site, pursuant to the Cooperation Agreement, Hammer, as representative of HRA

and Keisling, on behalf of the Corporation, met with Mayor Reed on August 21, 1984 to discuss, among other things, what to do about Vartan's announced intention to place a high rise office building there. Keisling spoke at this meeting but it does not appear that Mayor Reed or Hammer were coerced in any way, as argued by plaintiff. Certainly, they were persuaded and influenced by Keisling but ultimately the only reasonable conclusion that can be drawn from the testimony concerning the meeting is that the Mayor and Hammer were convinced that Vartan's property had to be condemned to protect the proposed hotel and office building project. The Mayor testified that Keisling was "persuasive." Hammer stated that, while he had "reservations" about doing so, he agreed that the property should be taken. Accordingly, the letter of August 24, 1984, signed by all three representatives, was sent to members of the Corporation, HRA and the Parking Authority, initiating the preliminaries for the seizure of Vartan's property. Vartan received a copy of this letter.

Supervision by the municipality and HRA is sufficient to satisfy the active state supervision requirement. *See Trinity Ambulance Service, Inc. v. G. & . L. Ambulance Service, Inc.,* 625 F.Supp. 142 (D.Conn. 1985), *aff'd per curiam,* 787 F.2d 86 (2d Cir.1986). That requirement was satisfied here. Clearly, the Mayor and Hammer agreed with Keisling that Vartan's property should be condemned.

There is no evidence of "acquiescence," as argued by plaintiff. Vartan has presented no evidence that Mayor Reed and Hammer were pressured into this decision. The only evidence is from these two individuals and they indicated that they freely agreed with Keisling on the taking of the Chestnut Street site.

Under these circumstances, it is not significant that the City and HRA may have been pressured into executing the Cooperation Agreement. Mayor Reed and Hammer did have a further course of action open to them under that Agreement if they disagreed with Keisling. They could have sent the matter to private arbitrators.

Leaving aside whether it would have been legal for public officials to have done this, it still remains that they failed to do so. Hence, there is no causal link between the alleged illegal nature of the contractual relationship between the parties and the interference with Vartan's property rights, since, in any event, the appropriate public officials agreed that the property should be taken.

We turn now to the circumstances surrounding Vartan's failure to acquire and develop the Walnut Street site. Unlike the Chestnut Street site, no use was designated for this property in the Plan. HRA owned it but the City had beneficial title. Vartan's attempt to develop this lot was made against the backdrop of the City's and HRA's attempt to build a hotel and office building project on Market Square. The decision by Mayor Reed and Hammer not to permit Vartan to develop on the Walnut Street site, while influenced by Keisling, was solely their own. The Mayor and Hammer did not want Vartan to interfere with their own plans for the hotel and office complex. While this conduct would normally have subjected them to antitrust liability, their action was authorized by the Commonwealth and therefore immune.[5]

## B. *Vartan Has Failed to Assert A Valid Due Process Claim.*

Vartan asserts a violation of both his procedural and substantive due process rights in connection with his Chestnut Street site. Procedural due process has allegedly been violated because the City and HRA permitted a biased entity, the Corporation, to influence how he could use his property. Substantive due process has

allegedly been violated because the concentration of power in the Corporation to decide how Vartan's property can be used is not rationally related to a legitimate state interest.

We conclude that both of these claims must fail for the reasons set forth by defendants. Neither one of them has matured yet. In connection with the procedural due process claim, before a declaration of taking could be filed, Vartan sued in state court to enjoin any such action. The trial court granted this relief. The commonwealth court recently reversed, holding that a property owner can only force a condemnation not enjoin one. That decision is now on appeal to the Pennsylvania Supreme Court. Thus, as yet, there has been no actual condemnation of Vartan's property and no adverse adjudication against the merits of his claim that his property should not be condemned pursuant to the Plan. As noted by the commonwealth court in the state court action, once condemnation proceedings begin, Vartan can argue against the taking by filing preliminary objections in state court. When the biased decisionmakers Vartan complains of are subject to further independent review, there can be no claim that procedural due process has been violated.

The same analysis applies to the substantive due process claim. The Corporation may have been biased in its decision to obtain Vartan's property but the property cannot be taken until Vartan's objections are heard in state court. Until that time, there simply has been no due process injury. As stated by this court in *Kao v. Red Lion Municipal Authority*, 381 F.Supp. 1163, 1166 (M.D.Pa.1974) (brackets added):

---

5. Keisling and the Corporation have further argued that their actions are protected by the *Noerr-Pennington* doctrine which provides that "bona fide efforts to obtain or influence legislative, executive, judicial or administrative actions are immune from antitrust liability." *Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.,* 690 F.2d 1240, 1251 (9th Cir.1982), *cert. denied,* 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983). The doctrine is intended to protect an individual's first amendment rights. *Ottensmeyer v. Chesapeake & Potomac Telephone Co.,*

756 F.2d 986 (4th Cir.1985). *See also Chambers Development Co., Inc. v. Municipality of Monroeville,* 617 F.Supp. 820 (W.D.Pa.1985) (councilman's actions in official capacity is immune under state action doctrine and in individual capacity under the *Noerr-Pennington* doctrine). The doctrine is therefore inapplicable here because all of the actions taken by Keisling and the Corporation were undertaken in an official capacity. Keisling's conversations with Mayor Reed and Hammer were performed as part of his duties with the Corporation.

The Pennsylvania Constitution and Eminent Domain Code fully preserve all the constitutional rights due plaintiffs with respect to the public taking, injury or destruction of private property. No assertion has been made that plaintiffs have been denied an opportunity to press their claims in the state court. There is no reason to believe that the Commonwealth of Pennsylvania will not accord full constitutional protection to plaintiffs' property rights. In light of this fact, there is no federal constitutional violation. [citations omitted].

*See also Kadash v. City of Williamsport,* 362 F.Supp. 1343 (M.D.Pa.1973) in which the court also noted that until condemnation proceedings have actually commenced, the case is not yet justiciable.

C. *Conclusion.*

Plaintiff's federal claims will be dismissed. The pendent state law claims will be transferred to the Court of Common Pleas of Dauphin County, Pennsylvania since we no longer have jurisdiction over them. *See Braderman v. Pennsylvania Housing Finance Agency,* 610 F.Supp. 1069 (M.D.Pa.1985).

Defendants filed a motion to compel discovery and for sanctions. Plaintiff opposed that motion and cross-moved for sanctions. The motion to compel is dismissed as moot. The cross-motions for sanctions are denied.

We will issue an appropriate order.

### ORDER

AND NOW, this 13th day of March, 1987, it is ordered that:

1. Counts 1, 2, 3 and 9 of the complaint are dismissed with prejudice.

2. Counts 4 through 8 of the complaint, the pendent state claims, are hereby transferred to the Court of Common Pleas of Dauphin County, Pennsylvania.

3. HRA's and Keisling's motion to compel is denied.

4. The cross-motions for sanctions are denied.

5. The Clerk of Court shall close this file.