**John O. VARTAN, Plaintiff,**

v.

**HARRISTOWN DEVELOPMENT CORPORATION and William Keisling, Defendants and Third Party Plaintiffs,**

v.

**CITY OF HARRISBURG, et al., Third Party Defendants.**

**Civ. A. No. 84–1395.**

United States District Court,
M.D. Pennsylvania.

June 15, 1987.

598

Patrick T. Ryan, Drinker, Biddle & Reath, Philadelphia, Pa., N. Timothy Guarneschelli, Joseph A. Klein, Harrisburg, Pa., for plaintiff.

Eugene E. Pepinsky, Jr., Wayne M. Pecht, Harrisburg, Pa., for Hamilton Bank.

Bruce F. Bratton, Connelly, Martsolf, Reid, Bratton & Spade, Harrisburg, Pa., for Hammer and Harrisburg Redevelopment Authority.

Judith B. Schimmel & Jack Hardy, Harrisburg, Pa., for City of Harrisburg & Stephen R. Reed.

Stuart J. Magdule, Solicitor, Harrisburg, Pa., for Redevelopment Auth. & Hammer.

Francis B. Haas, Jr., F. Murray Bryan, McNees, Wallace & Nurick, Harrisburg, Pa., and Lewis Bernstein, P.C., Thomas E. Silfen, Arnold & Porter, Washington, D.C., for Harristown Development & Keisling.

Thomas Devlin, Dept. of General Services, Harrisburg, Pa., for intervenor.

## MEMORANDUM

CALDWELL, District Judge.

### I. *Introduction And Background*

Plaintiff, John O. Vartan, has filed a motion for reconsideration of our memorandum and order, dated March 13, 1987, 655 F.Supp. 430, granting defendants, Harristown Development Corporation (Corporation) and William Keisling, summary judgment on Vartan's antitrust and other federal claims. The motion, made pursuant to Local Rule 604, may also be considered as one to alter or amend the judgment pursuant to Fed.Rule Civ.P. 59(e). *See DeLong Corporation v. Raymond International, Inc.*, 622 F.2d 1135 (3d Cir.1980). It is addressed to our sound discretion. *Harsco Corporation v. Zlotnicki*, 779 F.2d 906 (3d Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 2995, 90 L.Ed.2d 982 (1986); *Florencio Roman, Inc. v. Puerto Rico Maritime Shipping Authority*, 454 F.Supp. 521 (D.P. R.1978).

This case arises from Vartan's failed attempts to construct office buildings on two sites in downtown Harrisburg, referred to in this litigation as the Walnut Street site and the Chestnut Street site, because of the actions of the defendants and third party defendants, the City of Harrisburg, the Harrisburg Redevelopment Authority (HRA), Bernard Hammer, HRA's chairman, and Harrisburg's mayor, Stephen R. Reed, in blocking Vartan's development of the sites. The factual and legal background is set out in greater detail in our previous memorandum. *See* 655 F.Supp. 430 (M.D.Pa.1987).

In that memorandum, we granted the Corporation's and Keisling's motion for summary judgment on the antitrust claims on the basis of the state action doctrine recently discussed in *Hancock Industries v. Schaeffer*, 811 F.2d 225 (3d Cir.1987), although we did not cite that case in the memorandum. Under the state action doctrine, we found that the defendants' actions had been taken pursuant to a clearly expressed state policy found in the Pennsylvania Urban Redevelopment Law, despite Vartan's claim that the relationship between the Corporation, HRA and the City was illegal under this Law. Additionally, we found that the Corporation and Keisling had been actively supervised by the City, through Mayor Reed and by HRA, through its Chairman, Bernard Hammer. Thus, it was immaterial that plaintiff claimed the Corporation was a private entity subject to antitrust scrutiny. We therefore concluded that the antitrust laws did not apply to defendants.

We also rejected Vartan's substantive and procedural due process claims, concluding that procedural due process was satisfied when Vartan had available to him court review of the decision to take his Chestnut Street site and that a substantive due process claim could not be asserted until the Chestnut Street site had actually been taken.

Vartan seeks reconsideration of all the issues decided adversely to him and sets forth new arguments in response to our memorandum. Vartan also relies in the instant motion upon affidavits executed by the third party defendants, Mayor Reed and Chairman Hammer, subsequent to the granting of the summary judgment. We will deal with plaintiff's new arguments below.

## II. *Discussion*

### A. *The Corporation Must Show Active State Supervision to be Entitled to the Protection of the State Action Doctrine.*

█ Under the state action doctrine, the antitrust laws do not apply to conduct undertaken by a state through its legislature. *324 Liquor Corp. v. Duffy*, — U.S.—, 107 S.Ct. 720, 93 L.Ed.2d 667 (1987). The exemption can apply, however, to other entities as made clear by the Supreme Court's recent decisions in *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985) and *Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985). For a municipality to obtain the exemption, it must show that its anticompetitive activities were authorized by the state pursuant to a state policy to displace competition with regulation or monopoly public service. *Hancock Industries, supra*, 811 F.2d 233 (quoting *Town of Hallie*). A private entity must show, in addition to authorization by a state policy, that the policy was actively supervised by the state itself. *Id.* at 235. This is the two-pronged *Midcal* test. *See California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980).

Private decisionmakers must satisfy the second prong because, as noted by the Third Circuit in *Hancock Industries*:

[A]ctive supervision is "one way of ensuring that the actor is engaging in the challenged conduct pursuant to state policy." *Id.* This assurance is required when "a private party is engaging in the anticompetitive activity, [because] there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State." *Id.*, [471 U.S.] at 47, 105 S.Ct. at 1720.

The *Hallie* Court contrasted this private decisionmaking situation with one in which a municipality is engaging in the challenged conduct:

Where the actor is a municipality, there is little or no danger that it is involved in a *private* price-fixing arrangement. The only real danger is that it will seek to further purely parochial public interests at the expense of more overriding state goals. This danger is minimal, however, because of the requirement that the municipality act pursuant to a clearly articulated state policy. Once it is clear that state authorization exists, there is no need to require the State to supervise actively the municipality's execution of what is a properly delegated function. *Id.*

*Id.* at 235 (brackets added in part) (emphasis in *Hallie*).

In our previous memorandum, we had declined to pass upon whether the Corporation was a public entity or a private one because we had concluded, in any event, that the Corporation had been actively supervised by HRA and the Mayor. Plaintiff urges us to dispose of this issue so that he can expeditiously pursue his case. We agree that our consideration of this issue would aid the prompt and orderly disposition of this action. We also agree with Vartan that the Corporation must be considered a private entity for the purposes of the state action doctrine.

The Corporation is not typical of private entities considered in previous cases. Most of those cases dealt with purely private

entities, independent businesses intended to profit their private owners. *See, e.g., Southern Motor Carriers, supra* (common carriers); *Midcal, supra* (wine producers, wholesalers and rectifiers). In the instant case, the Corporation, at least at the beginning of its existence, could claim to be a public entity of some sort. It was created as a non-profit corporation to assist HRA in the redevelopment of downtown Harrisburg. Its articles of incorporation stated that it was incorporated to "combat community deterioration ... by planning for and participating in the redevelopment of the central business district of the city of Harrisburg...." Defendants cited state case law describing the Corporation as "not a private enterprise.... The Harristown Project in which it is, with the City, the Authority, the Commonwealth and Bell engaged, is a proper and needed public enterprise." *Appeal of German,* 27 Pa.Cmwlth. 108, 115, 366 A.2d 311, 315 (1976). Defendants also pointed out that the Corporation was holding public money for the sole purpose of redevelopment and that Vartan's suit threatened those funds. Vartan has also relied upon state law to establish the private nature of the Corporation, citing 15 Pa.C.S. § 7503.

But we do not have to look to state law to determine if the Corporation is a public entity. Nor is it relevant that public monies would be threatened. A municipality itself is subject to antitrust liability if it has not acted pursuant to an established state policy. *Town of Hallie, supra.* The public funds it controls are also threatened. The only reason a municipality need not be actively supervised is because there is little or no danger it is engaged in a private anticompetitive scheme. Although it could pursue purely parochial goals at the expense of overriding state ones, that danger is minimized when the municipality must follow a clearly articulated state policy. *Town of Hallie, supra; Hancock Industries, supra.* We believe the relevant inquiry should be whether the Corporation is

entitled to the same presumption concerning its goal.

▮ Bearing in mind this consideration, we conclude that the Corporation is a private entity—as presently constituted and organized—which must show active state supervision to claim the protection of the state action doctrine. The conclusive factor is that its Board of Directors, who also act as the Corporation's members, is comprised of private individuals who control, without any input from any public body, membership on the Board. (Plaintiff's appendix at p. 252). This contrasts with the original intent of the Corporation's By-Laws which empowered various public officials to control membership in the Corporation and the Board.[1] (See defendants' appendix at p. 40662, By-Laws, Art. IV, §§ 4.1, 4.2 and Art. VI, § 6.1). Additionally, the record indicates that at least one member of the Board has expressed the belief that the Board should not always be in accord with public officials because the latter, being subject to voter approval, often allegedly only have short range goals in mind. Under these circumstances, we cannot presume, as we could with a public body, that there is no danger that the Corporation would engage in a private anticompetitive scheme.

B. *The Active State Supervision Requirement Has Been Satisfied Here.*

1. *Supervision By the City and HRA Is Sufficient.*

Vartan argues that we erred in concluding that supervision by the City and HRA is sufficient. He claims only the Commonwealth can provide the requisite supervision. He emphasizes the following language from *Midcal, supra*:

First, the challenged restraint must be "one clearly articulated and affirmatively expressed as state policy"; second, the policy must be *"actively supervised"* by the State itself. [citation omitted].

---

**1.** We also note here that in *Appeal of German,* relied upon by defendants, the Commonwealth Court, in concluding that the Corporation was not a private enterprise, said, in passing, that

the members of its Board represented the City, the Commonwealth, Dauphin County, and other public interests. 27 Pa.Cmwlth. at 108, 366 A.2d at 315. As noted above, this is no longer true.

445 U.S. at 105, 100 S.Ct. at 943, 63 L.Ed.2d at 243 (brackets added) (emphasis added).

Plaintiff claims that supervision by the state itself is fundamental to the second prong of the *Midcal* test. Under the state action doctrine, he argues "non-sovereign public actors," presumably municipalities like the City, may exercise delegated authority and remain immune, but those entities cannot confer immunity upon private parties by supervising them. Vartan cites as further support for this position *Riverview Investments, Inc. v. Ottawa Community Improvement Corp.*, 774 F.2d 162 (6th Cir.1985), in which the Sixth Circuit Court of Appeals concluded that the state had to provide the necessary supervision, and *City Communications, Inc. v. City of Detroit*, 650 F.Supp. 1570 (E.D.Mich.1987).

We relied upon *Trinity Ambulance Service, Inc. v. G. & L. Ambulance Service, Inc.*, 625 F.Supp. 142 (D.Conn.1985), *aff'd per curiam*, 787 F.2d 86 (2d Cir.1986), in concluding that supervision by the City and HRA was sufficient to satisfy the second prong of the *Midcal* test. We remain convinced that the approach taken by the court in *Trinity Ambulance* and by the case it cites, *Gold Cross Ambulance and Transfer v. City of Kansas City*, 705 F.2d 1005 (8th Cir.1983), *cert. denied*, 471 U.S. 1003, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985), is the better one. In *Gold Cross*, in connection with a municipality's grant of an exclusive ambulance service contract, the court stated:

> We also believe that requiring active state supervision over a municipal function such as the one present here is unwise. The State of Missouri has authorized its municipalities to provide ambulance service because it believes that such service is a proper local activity. To require the state to supervise Kansas City's ambulance system once the city has elected to exercise its authority to establish the system makes little sense. As the dissent in *Community Communications Co. v. City of Boulder, supra*, 455 U.S. [40] at 70–71 & n. 6, 102 S.Ct. [835] at 850–851 & n. 6 [70 L.Ed.2d 810 (1982)] (Rehnquist, J., dissenting), observed in concluding that the state super-

vision requirement does not apply to municipal conduct, "[i]t would seem rather odd to require municipal ordinances to be enforced by the State rather than the city itself." Finally, requiring state supervision could force the state and its municipalities to engage in duplicative, wasteful regulation and could erode the local autonomy that the state has sought to encourage. *See Town of Hallie v. City of Eau Claire, supra*, 1983–1 Trade Cases at 69,339 [700 F.2d 376 (7th Cir. 1983)].

*Id.* at 1014–15 (footnote omitted) (brackets added).

■ We would also note that in *City Communications*, the district court sitting in the Sixth Circuit, while rejecting a defense argument that state supervision could be supplied by a municipality acting pursuant to a state policy, noted that the argument was "attractive" but was expressly rejected by the court in *Riverview Investments*. We therefore reject Vartan's argument that HRA and the City could not provide the necessary supervision.

### 2. HRA Is Not Part of the Commonwealth. It is a Municipal Corporation Akin to a Municipality.

Plaintiff has requested that we rule upon the status of HRA. Vartan urges that it is not a state agency or part of the Commonwealth, which would allow its conduct to be considered active state supervision. Disposition of this issue is not crucial for our purposes since we have already decided that a municipality can provide the requisite supervision. Vartan may appeal this case, however, and if the Third Circuit concludes that only the sovereign can provide the necessary supervision, our consideration of this issue now may serve to clarify the issues on appeal.

Vartan relies upon state cases to establish that HRA is not an instrumentality of the Commonwealth. He cites *Greer v. Metropolitan Hospital*, 235 Pa.Super. 266, 341 A.2d 520 (1975), which held that a redevelopment authority was not part of

the Commonwealth and thus not entitled to share in state sovereign immunity.

State court decisions construing the nature of the agency are important to determine its status within the political organization of the state. But because we are determining HRA's status for the purposes of federal antitrust law, we believe a better analysis would use the Third Circuit test dealing with whether a political instrumentality can invoke sovereign immunity under the eleventh amendment to the federal constitution. That test considers the following factors:

> [L]ocal law and decisions defining the status and nature of the agency involved in its relation to the sovereign are factors to be considered, but only one of a number that are of significance.
>
> Among the other factors, no one of which is conclusive, perhaps the most important is whether, in the event plaintiff prevails, the payment of the judgment will have to be made out of the state treasury; significant here also is whether the agency has the funds or the power to satisfy the judgment. Other relevant factors are whether the agency is performing a governmental or proprietary function; whether it has been separately incorporated; the degree of autonomy over its operations; whether it has the power to sue and be sued and to enter into contracts; whether its property is immune from state taxation, and whether the sovereign has immunized itself from responsibility for the agency's operations.

*Skehan v. State System of Higher Education,* 815 F.2d 244, 247 (3d Cir.1987) (quoting *Urbano v. Board of Managers of New Jersey State Prison,* 415 F.2d 247, 250–51 (3d Cir.1969), *cert. denied,* 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 129 (1970)).

■ After reviewing HRA's powers in light of the statutory scheme established in the Redevelopment Law, and the factors set forth above, we conclude on balance that HRA is not a part of the Commonwealth and hence cannot be considered the sovereign when supervising the actions of the Corporation.

First, as noted above, state courts have not conferred state sovereign immunity upon redevelopment authorities, construing them to be "municipal corporations." *Greer, supra,* 235 Pa.Super. at 280, 341 A.2d at 527. Second, at least as contemplated by the statutory scheme, HRA is supposed to possess fiscal autonomy and hence could satisfy any judgment against it. *See* 35 P.S. § 1709(i), (j), (o), (p), § 1713. Third, redevelopment authorities have a great degree of autonomy over their operations. They are separately incorporated, having been granted "all powers necessary and appropriate" by the Commonwealth to carry out their functions. 35 P.S. § 1709. They can sue and be sued and enter into contracts. *Id.* at § 1709(q), (t). Fourth, the Commonwealth has also immunized itself and its municipalities from liability on an authority's bonds or other obligations. *Id.* at § 1713. Finally, authority commissioners are appointed by local officials, not by the Commonwealth. *Compare Braderman v. Pennsylvania Housing Finance Agency,* 598 F.Supp. 834 (M.D.Pa.1984) (although agency was not part of the Commonwealth for eleventh amendment purposes, that certain members of its governing board were appointed by the governor was one factor indicating the agency was part of the sovereign), and, while authorities are created by the Commonwealth, they do not become operative until municipalities decide to make them so. *Id.* at § 1704(a).

Two factors militate against the conclusion that a redevelopment authority is not a part of the Commonwealth. First, an authority is designated in the Law as a "public body, corporate and politic, exercising public powers of the Commonwealth as an agency thereof...." This factor, however, should not in itself be determinative. *See Port Authority Police Benevolent Association, Inc. v. Port Authority of New York,* 819 F.2d 413 (3d Cir.1987); *Blake v. Kline,* 612 F.2d 718 (3d Cir.1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1112 (1980). Second, HRA is performing a governmental function in aiding the redevelopment of downtown Harrisburg although

construction and reconstruction of buildings is also typically performed by private redevelopers like Vartan. *See Braderman, supra.* We conclude on balance, however, that HRA is not a part of the Commonwealth and that its supervision could not be considered that of the state directly.

### 3. *Active Supervision Took Place Here.*

Vartan first argues that the procedure adopted by the City, HRA and the Corporation for determining what properties would be taken and used for redevelopment fail as a matter of law to provide the active supervision required by *Midcal, supra.* The procedure must leave ultimate authority and responsibility in the public officials. Additionally, in Vartan's view, the question is not whether specific conduct was specifically approved. Rather, a method must exist, independently of any specific conduct by a public official which could fulfill the *Midcal* criterion, by which supervisory authority is retained by public officials. Plaintiff cites *Midcal, Southern Motor Carriers, supra,* and *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), in his support. This reliance is misplaced.

Plaintiff attempts to contrast *Midcal* and *Cantor* with *Southern Motor Carriers* to establish that only when a state has placed a formal regulatory review mechanism in place can the second prong of the *Midcal* test be satisfied. We have no quarrel with plaintiff's statement of the relevant facts and holdings of these cases. We do disagree with his conclusion that the cases establish as an essential element of active supervision that a formal procedure for reviewing private conduct, reposing ultimate authority and responsibility in the state, must exist before the private entity can claim antitrust immunity. But, even in the absence of an adequate procedure conduct by public officials can supply the requisite supervision.

Certainly, in *Midcal* and *Southern Motor Carriers,* regulatory review, or the lack of it, played a crucial role, but only because the claims arose in the context of activities purportedly subject to state agency control. Contrary to plaintiff's assertion, a crucial question in both of these cases was "whether the state 'in fact' and 'specifically' carried out its duty of active supervision." (Plaintiff's brief in support of motion for reconsideration at p. 12). Thus, in *Southern Motor Carriers* regulatory schemes were in place in four states by which motor carriers could submit joint rate proposals to the public service commission in each state. The rate became effective if the state agency took no action within a specified period. The agency could decide to schedule a hearing. If so, the rate became effective only after affirmative agency approval. The Supreme Court held that this constituted sufficient active state supervision. Plaintiff draws from this conclusion that the Supreme Court considers it crucial that adequate procedures exist since there is always the possibility that the state will not review a particular rate submission. We do not believe the possibility that a particular rate request would not be reviewed by the agency played a part in the Court's decision. The Court did note that a rate would take effect if there was no agency action but this is not the same as saying that there would be no review. The case was argued and decided on the basis that review would take place regardless of whether the agency would decide to hold a hearing or not. The Court's approval of the supervision which occurred in *Southern Motor Carriers* cannot support plaintiff's argument. And, of course, since *Midcal* and *Cantor* undoubtedly involved instances where state agencies clearly exercised no supervision over the private entity's conduct, specific or otherwise, they have no significance either.

We have concluded that active supervision does not have to be as inflexible as plaintiff perceives it. For example, in *Woolen v. Surtran Taxicabs, Inc.,* 615 F.Supp. 344 (N.D.Tex.1985), *aff'd per curiam,* 801 F.2d 159 (5th Cir.1986), active supervision was evidenced by the contracts entered into by the municipalities and the

private taxicab companies. The court stated:

> In the instant actions, there is no doubt that the Cities of Dallas and Fort Worth, and the Regional Airport Board, have actively supervised the private defendants' conduct. The details of taxicab service at the airport are set forth comprehensively in the contracts between D/FW Surtran Systems and Surtran Taxicabs, Inc., attached to the complaints. Further, the successive contracts show a gradually changing approach to ground transportation at the airport. For example, the 1979 Contract allows Surtran Taxicabs to subcontract with other taxicab companies for provision of service at the airport.

*Id.* at 350.

Significantly, the court did not speak about bidding procedures but only about the particular contracts entered into.

The same conclusion follows from an examination of *Riverview Investments, supra.* There, the defendant, Ottawa Community Improvement Corporation, a non-profit corporation, had an agreement with the Village of Ottawa to approve industrial revenue bonds. Plaintiff developer applied for, but did not receive, approval for bonds to be used to finance its project. Reversing a grant of summary judgment in favor of defendants, the appellate court remanded for a factual determination of whether the corporation had been actively supervised. The court said that the following questions had to be answered:

> (1) Whether the Village of Ottawa or the Ottawa Community Improvement Corporation made the effective decision to reject appellant's bond application. If the District Judge concludes that the Village of Ottawa did, the order denying relief should be reentered. (2) If the District Judge determines that the Community Improvement Corporation made the effective decision, then evidence should be taken on whether in rendering its decision the Community Improvement Corporation was actively supervised by the state. If there was such supervision, the

decision was protected under state action immunity, otherwise not.

769 F.2d at 330.

The court did not require that adequate procedures be found to have existed. The crucial question was which entity was the effective decisionmaker. *See also City Communications, Inc. v. City of Detroit,* 660 F.Supp. 932 (E.D.Mich.1987) (Westlaw and Lexis) (the state supervision requirement should not be mechanically applied to all private defendants in municipal antitrust actions).

Plaintiff quotes *In re Real Estate Title And Settlement Services Antitrust Litigation,* MDL No. 633 (E.D.Pa. Sept. 9, 1985) (Westlaw and Lexis), in which the court stated:

> The focus of the active state supervision requirement is on the procedures by which the state controls the challenged setting of prices, not on the behavior or effectiveness of individual state employees in carrying out those procedures.

(plaintiff's brief in support of motion for reconsideration at p. 15).

This quotation must be examined in context. *Real Estate Title* was multidistrict litigation challenging rate-setting decisions in various states. It was therefore similar to *Southern Motor Carriers.* Plaintiffs attempted through interrogatories to establish bad faith or corrupt ratemaking decisions by obtaining information concerning payments to state employees which may have influenced their decisions in individual cases. The district court concluded that the information sought was not discoverable because, citing *Llewellyn v. Crothers,* 765 F.2d 769 (9th Cir.1985), the behavior of public officials or their effectiveness in carrying out state procedures did not affect state action immunity. Rather, based upon *Midcal,* the focus was upon whether the procedures provided active state supervision.

We think the court's decision was correct in the circumstances of that case although, at first blush, it would seem to lend support to plaintiff's argument here. *Real Estate Title,* and the cases it relied upon, could be broadly interpreted to mean that

the subjective intent of public officials, whether good or bad, or the correctness of their conduct under state law, is irrelevant to state action immunity and that only the effectiveness of the established procedures in controlling a private actor is relevant. In this regard, we would agree with plaintiff that the procedure provided in the Cooperation Agreement for resolving disputes and determining how redevelopment would proceed is not sufficient since it does not place ultimate authority and responsibility in the public officials.

Nevertheless, plaintiff's focus on the procedures available in this case, and reliance upon *Real Estate Title* and cases similar to it, are misplaced for the following reasons. First, those cases challenged the actions of public officials as being motivated by bad faith or having an ulterior economic motive. In *Llewellyn*, the district court had concluded that evidence existed showing that two of the defendant officials "did not like [the plaintiff] chiropractors as a group" and may have sought ways "to get the chiropractors," who were challenging state action on chiropractic fee schedules, among other things. 765 F.2d at 774 (brackets added). In *Hancock, supra*, plaintiff trash haulers claimed that the district court erred in refusing them discovery of the motives of the defendant county officials in denying plaintiffs access to waste disposal sites. Plaintiffs claimed that the restrictions were imposed to extort an unconscionable price for disposal by the City of Philadelphia for which the haulers worked. And, as noted previously, plaintiffs in *Real Estate Title*, wanted to explore the possibility that public officials had made rate making decisions based upon wrongful payments.

Second, those cases did not challenge the procedures used by the officials for their sufficiency under the state action doctrine. Thus, in *Llewellyn*, the court of appeals

noted that the relevant defendant's conduct "was not overruled by the state supervisory process." 765 F.2d at 774. In *Hancock* there simply was no issue of adequate supervision since the conduct complained of was the conduct of the municipal officials themselves. In *Real Estate Title*, plaintiffs admitted the rate making procedures were adequate. *See* Trade Cases (CCH) ¶ 67,149 (E.D.Pa. June 10, 1986) [Available on WESTLAW, DCT database], *aff'd without opinion*, 815 F.2d 695 (3d Cir.1987).

The instant case is different because Vartan is not arguing that, despite the presence of state procedures which would insure public supervision and control of private parties, the public officials have acted with ill will toward him. In other words, he is not arguing that Mayor Reed and Hammer were "out to get Vartan." Rather, he is asserting the converse; that despite the presence of apparent good faith on the part of the public officials, the inadequacy of the procedural controls over the private actor prohibits a finding of state action immunity.[2]

■ We conclude that *Llewellyn, Hancock* and *Real Estate Title*, should not apply to the latter circumstances despite the apparent consistency of doing so.[3] The courts' refusal to consider claims of bad faith is based upon consideration of federalism and state sovereignty. *City Communications, Inc. v. City of Detroit*, 650 F.Supp. 1570 (E.D.Mich.1987). As stated by the Third Circuit in *Hancock*:

> We agree with the Ninth Circuit's analysis and conclusion in *Llewellyn v. Crothers*, 765 F.2d 769 (9th Cir.1985):
>
> The availability of *Parker [v. Brown*, 317 U.S. 314, 63 S.Ct. 307, 87 L.Ed. 315 (1943)] immunity ... does not depend on the subjective motivations of the individual actors, but rather on the sat-

**2.** Of course, the reason why Vartan's plans were blocked was to prevent competition with the City's redevelopment plans. That "ulterior economic motive" should play no part in the circumstances of this case when plaintiff and the municipality were engaging in the same business.

**3.** Plaintiff could argue it is not consistent for the courts to ignore specific claims of bad faith on the part of public officials merely because the procedures in place generally provide for adequate control and then rely upon the good faith of public officials in a specific instance when the procedures are inadequate.

isfaction of the objective standards set forth in *Parker* and authorities which interpret it. This must be so if the state action exemption is to remain faithful to its foundations in federalism and state sovereignty. A contrary conclusion would compel the federal courts to intrude upon internal state affairs whenever a plaintiff could present colorable allegations of bad faith on the part of defendants.

811 F.2d at 234 (quoting *Llewellyn*, 765 F.2d at 774).

Thus, a federal court will not relitigate a specific decision made by a public official under adequate supervisory procedures, even when a plaintiff claims and could possibly prove that the decision was tainted by ill-will, to avoid intruding upon a state's internal affairs. Policy overrides the result in a specific case.

■ The factor of state sovereignty is absent in the case at bar as well as any claim of bad faith. In fact, our previous memorandum could be viewed as being in accord with *Hancock Industries* and *Llewellyn*. It would seem to be an intrusion upon state sovereignty for us to permit an antitrust lawsuit to second guess a decision freely made by public officials. The officials should be permitted to exercise their independent judgment despite the presence of inadequate procedures, when those procedures played no part in their determination. For the same reason, it would also seem to be a perversion of the state action doctrine to subject decisions of this kind to antitrust scrutiny. Perhaps, the Corporation was not supervised in the sense of prior cases, and as would have been required in the circumstances of those decisions. Significantly, the record before us when considering the motion for summary judgment, however, indicates no compulsion on the part of the Corporation arising from its economic power or from the provisions of the Cooperation Agreement. We conclude that the officials' uncoerced approval of Kiesling's plans constitutes adequate supervision here.

### 4. *Mayor Reed's And Hammer's Agreement Was Freely Given.*

Plaintiff argues that Mayor Reed and Hammer did not really consent to the proposed taking. To bolster this argument Vartan has submitted in connection with his motion for reconsideration additional evidence in the form of the affidavits of Mayor Reed and Hammer which enlarge materially on their previous deposition testimony. Hammer's affidavit may be summarized, in material part, as follows:

1. At the time of the August 24, 1984, meeting HRA had no choice but to accept the Corporation's representations concerning redevelopment in downtown Harrisburg since the Corporation controlled all funds and HRA could not fund studies and analyses, being forced to rely upon the Corporation. (¶ 8).

2. The Corporation alone had the information concerning the need to take Vartan's property for a parking garage. (¶ 9).

3. Hammer went along with the decision to take Vartan's property because he believed that the Corporation would withhold necessary cooperation from the hotel/convention center project then being considered for the downtown. (¶ 11).

4. An additional consideration for going along with the Corporation was that HRA could not unilaterally prevent the taking. Under the Cooperation Agreement, it could only place the matter before arbitration. (¶ 11).

Mayor Reed's affidavit concurs with Chairman Hammer's. Additionally, he asserts his description of Keisling's argument in favor of the taking as "persuasive", noted by us in our previous memorandum, was meant ironically, not literally. (¶ 3). Vartan has also submitted Mayor's Reed's entire deposition and has cited portions of it which were not provided to us at the time the summary judgment motion was briefed.

■ This testimony may have had a substantial impact on our consideration of that motion but we cannot consider it in deciding the instant motion for reconsideration. In *Harsco v. Zlotnicki*, 779 F.2d 906 (3d Cir.1985), *cert. denied*, —— U.S. ——, 106

S.Ct. 2895, 90 L.Ed.2d 982 (1986), the Third Circuit Court of Appeals stated:

> The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence. *Keene Corp. v. International Fidelity Insurance Co.*, 561 F.Supp. 656, 665 (N.D.Ill.1983). Where evidence is not newly discovered, a party may not submit that evidence in support of a motion for reconsideration. *DeLong Corp. v. Raymond International Inc.*, 622 F.2d 1135, 1139–40 (3d Cir.1980).

*Id.* at 909.

Vartan does not claim that the evidence is newly discovered. He also does not assert that it was unavailable or unknown to him at the time the motion for summary judgment was being considered. *See DeLong Corp. v. International Fidelity Insurance Co.*, 622 F.2d 1135 (3d Cir.1980).[4] Accordingly, we will reconsider our previous memorandum and order solely in light of the previous record evidence submitted.

Initially, we note that the situation in the instant case, while not conferring ultimate authority on the public officials, is not the same as *Midcal*. There, the state simply enforced wine prices set by private producers. Here, the Cooperation Agreement contemplates that public officials shall have a voice in any decision concerning redevelopment. The Corporation could not, as the producers in *Midcal* could, simply decide on a course of action, knowing that by law no public official could question its conduct. Rather, Keisling knew that any redevelopment proposal he wanted to accomplish had to first gain the unanimous

acceptance of both Mayor Reed and Chairman Hammer.

The evidence presented in connection with the summary judgment motion indicates that they did give that acceptance. We can agree with Vartan that Keisling took the initiative at the meeting and was the catalyst for the decision to block Vartan's purchase of the Chestnut Street site.[5] Nevertheless, the deposition testimony of Mayor Reed and Hammer, which was made available to us at the time of our memorandum and order, indicated that the Mayor and Hammer considered Keisling's presentation, weighed his argument, and decided to go along with it. There was simply no evidence of acquiescence—at least in the sense that we believe that word should be used as "passive assent or submission." Webster's Third New International Dictionary (1981).

As we noted in our previous memorandum, this testimony is further supported by the failure of either Mayor Reed or Chairman Hammer to seek appointment of private arbitrators if they disputed Keisling's decision. Either one of them could have forced the issue into arbitration. Neither did anything.

Alternatively, the Mayor and Hammer could be viewed as the effective decision-makers here thereby rendering the supervision requirement immaterial. In *City Communications, supra*, 660 F.Supp. at 935 (E.D.Mich.1987) (footnotes omitted), the court stated the following:

> This Court agrees with the defendants that, once it is determined that the municipality is entitled to immunity from the antitrust laws, the private parties

---

**4.** Vartan does assert we should consider the affidavits: (1) because they merely clarify and organize the affiants' testimony; (2) because defendants did not list the events of the August 24, 1984 meeting in their statement of material facts as to which there was no genuine issue to be tried, as required by Local Rule 401.4 and; (3) in the interest of justice. Based upon *Harsco*, we reject the first and third reasons. Additionally, we fail to see why the second ground should permit introduction of the affidavits since defendants' argument concerning the August 24 meeting was briefed by defendants, with appropriate reference to deposition testimony in connection with their motion for summary

judgment. In any event, the meeting was listed in defendants' statement of material facts in number 27. While the details of the participants' discussion were not set forth, the pertinent "fact", from defendants' point of view was set forth there; i.e., that the participants had "agreed" that Vartan's property should be taken.

**5.** Who took the initiative would appear to be immaterial in any event. Regulated companies take the initiative in submitting proposed rates but that does not mean that the State does not maintain control over them.

who are regulated by the municipality are also entitled to immunity as long as the "effective decision maker" is the municipality rather than the private parties. It is precisely on this issue that the Court is faced with a factual dispute. Were the City of Detroit's decisions that permitted the defendants to retain their exclusive cable television franchise made by the City, or did Barden and MacLean have so much influence that the decisions were effectively those of the private defendants? As the Sixth Circuit held in Riverview, if the private defendants were the effective decision makers, they will have to demonstrate that they operated under state supervision, while, if the City made the effective decisions, the antitrust claims against the private defendants will have to be dismissed.

The public officials' actions satisfy this standard. They became the effective decisionmakers by agreeing with Keisling and refusing to dispute him on the proposed taking by seeking arbitration. In short, we see no reason why the public officials could not agree with Keisling if that is what they wanted to do.

Vartan's memorandum in support of his motion for reconsideration refers to the Mayor's deposition testimony concerning previous threats of litigation by the Corporation against the City, how the City had to rely upon the Corporation for issues dealing with market absorption, how the City's views were almost exclusively based upon input from the Corporation, and that Mayor Reed's subsequent opinion was that the Corporation's actions were arbitrary and capricious. Vartan's reply brief dealing with the same motion refers to the newly submitted affidavits of Mayor Reed and Hammer, the substance of which has already been mentioned above. We emphasize, however, that none of this material, with the exception of the previous litiga-

tion, was made available to us when we made our original decision, and we do not have the authority to consider it now.

Vartan chose not to contest defendants' allegations concerning the Mayor's and Chairman Hammer's conduct at the crucial August 24 meeting. A significant part of his opposition to defendants' motion consisted of establishing the economic dominance of the Corporation and its seizure of power to control redevelopment. That may well have been relevant but it is not sufficient to establish defendants' liability. This case is not concerned with the illegal nature of the contractual arrangements under state law between the City, HRA and the Corporation. It is a federal antitrust lawsuit involving an unsuccessful attempt by plaintiff to develop two sites in downtown Harrisburg. The defendants interposed the defense of the state action doctrine and submitted evidence indicating that public officials approved of the challenged taking. It is not enough to show the existence of control by the private actor in the abstract, anymore than it is sufficient to simply prove negligence to establish a cause of action. The illegal conduct must be tied into the antitrust injury.

We would have expected that connection to come from Mayor Reed and Hammer but the submitted portions of their depositions were silent in this regard. Additionally, plaintiff did not argue in opposing the summary judgment motion that the Corporation controlled the information going to the Mayor and Hammer. In fact, the record at that point indicated the contrary. Chairman Hammer indicated he had access to a report on the parking situation, the Walker Report, months before the August 24 meeting, which would have let him independently assess the need to use Vartan's site for a parking garage, as argued by Keisling. (defendants' Appendix, Vol. I, p. 182).[6]

---

**6.** Vartan has also argued that Keisling fraudulently induced the agreement of the Mayor and Hammer but admits that there is no evidence concerning whether Keisling's representations to these public officials was true or false or made with the knowledge that they were false. Vartan argues that summary judgment is pre-

cluded to this extent. We believe, however, that Vartan had the duty of marshalling evidence on this issue at the time the summary judgment motion was made if he felt it was relevant. *See Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"[A]ctive supervision is 'one way of insuring that the actor is engaging in the challenged conduct pursuant to state policy.'" *Hancock Industries, supra,* 811 F.2d at 235 (quoting *Hallie, supra,* 471 U.S. at 46, 105 S.Ct. at 1720, 85 L.Ed.2d at 34). It also prevents a state from "casting ... a gauzy cloak of state involvement over what is essentially private" anticompetitive conduct. *Midcal, supra,* 445 U.S. at 106, 100 S.Ct. at 943, 63 L.Ed.2d at 243. As shown above, that purpose has been satisfied in the instant case, at least on the record that was submitted in connection with the summary judgment motion.

■ This would have been a different case if Mayor Reed and Chairman Hammer had opposed the Corporation's plan for Vartan's property. They could have done that by submitting the issue to arbitrators. An adverse decision from the arbitrators would have made the procedures set out in the Cooperation Agreement relevant to plaintiff's claim. In those circumstances, the public officials clearly would not have had control. Vartan is arguing the wrong case, a case which could have happened here, but which did not. We recognize that the Cooperation Agreement is troubling and that it could have caused problems. But the record does not indicate that it did. The purpose of the active supervision requirement is to ensure that people, presumably acting for the public welfare, rather than personal gain, make the anticompetitive decisions. *See Hancock Industries, supra.* Since the public officials here passed upon and agreed with the Corporation's decision, that requirement has been satisfied. We therefore disagree with Vartan's interpretation of our holding, set forth on page 3 of his memorandum in support of his current motion. Put accurately, our holding is that active supervision can exist when procedures do not place ultimate authority and control in public officials if the officials, nevertheless, voluntarily concur in the private entity's decision.

We will issue an appropriate order.

## ORDER

AND NOW, this 15th day of June, 1987, it is ordered that plaintiff's motion for reconsideration is hereby denied.